**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| INTER-MARKETING GROUP USA, INC., Derivatively on Behalf of Defendant CENTURYLINK, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JEFF STOREY, MARTHA H. BEJAR, VIRGINIA BOULET, PETER C. BROWN, KEVIN P. CHILTON, STEVEN T. CLONTZ, W. BRUCE HANKS, MARY L. LANDRIEU, HARVEY P. PERRY, GLEN F. POST, III, LAURIE A. SIEGEL, R. STEWART EWING, JR., DAVID D. COLE, KAREN PUCKETT, DEAN J. DOUGLAS, AND G. CLAY BAILEY, <br><br> Defendants, <br><br> and <br><br> CENTURYLINK, INC., <br><br> Nominal Defendant. | Case No.  18-1650 |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Inter-Marketing Group USA, Inc. ("Plaintiff"), by and through its undersigned counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Nominal Defendant CenturyLink, Inc. ("CenturyLink" or the "Company"), public litigation filings, as well as reports, analyst reports, press releases and other public statements issued on behalf of the Company.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of CenturyLink, Inc. against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively, the "Individual Defendants" or "Defendants") seeking to remedy Defendants' violations of state law, including, among other violations of law, breaches of fiduciary duties owed to the Company from March 1, 2013 through the present (the "Relevant Period"). Plaintiff's allegations are based upon personal knowledge as to those allegations concerning himself and as to all other allegations, upon the investigation of his counsel, which includes but is not limited to: i) review and analysis of public filings made by CenturyLink with the Securities Exchange Commission ("SEC"); ii) review of news articles, shareholder communications and postings on CenturyLink's website; iii) pleadings, papers and additional documents publicly available filed in the consolidated securities fraud class action lawsuit; and iv) review and analysis of other publicly available information concerning CenturyLink and the Defendants (defined below).

2.      Defendants breached their fiduciary duties by causing and/or knowingly allowing the Company to engage in an illegal scheme that involved routinely and systematically misquoting prices and improperly billing customers for services they did not request. This illegal practice, known as "cramming," was so pervasive at CenturyLink that, according to an internal CenturyLink audit, the Company potentially overbilled 3.5 million customers—a number representing over half of CenturyLink's 5.9 million broadband subscribers and one-third of its 12 million wireline subscribers.

3.      The Company's systemic overbilling was condoned and encouraged by the Company's senior leadership, which depended upon this illegal scheme to meet the financial

projections Defendants provided to Wall Street. Naturally, the fact that the Company overbilled half of its customers had a material financial impact on the Company's reported financial results. CenturyLink never once disclosed that the Company's reported revenues were a result of an illegal scheme.

4.    During the Relevant Period, Defendants publicly stated that CenturyLink would never "place or record an order for our products and services for a customer without that customer's authorization."    Instead, Defendants falsely attributed CenturyLink's substantial revenue and subscriber growth in its consumer and small business segments to the Company's focus on "customer needs" and its "customer first" sales approach, competitive "bundling" marketing strategy, and strict adherence to the Company's Unifying Principles: "fairness, honesty and integrity."

5.    Unfortunately, these representations were entirely false. Contrary to Defendants' representations, CenturyLink:

- routinely added services to customers' accounts without authorization, which would result in customers being charged for services they did not need, request, or approve;

- routinely and repeatedly lied to customers about the prices they would be charged, including by misrepresenting the terms and conditions required to obtain promotional discounts, the duration of discounted prices and other contract terms, and penalties for cancellation;

- systematically misquoted the prices of customer contracts by failing to disclose that "bundled" and other multiple service packages included fees for optional services that the customer did not need or authorize—a sales pitch developed by CenturyLink management, taught to sales trainees, and promoted at monthly sales meetings; and

- concealed other highly material contract terms and misled customers concerning significant limitations on their service including the suitability or availability of particular services (such as the available speed of broadband), the existence of "early termination fees," and other material terms.

6.      These deceptive practices were documented in the Company's computer systems, reviewed by the Company's quality assurance analysts, recorded in scores of employee termination and disciplinary investigations and proceedings, and detailed in internal audits and reports reviewed by senior management.  Indeed, CenturyLink potentially overbilled up to half of its subscribers.  Such widespread cramming did not and could not escape the attention of the Company's senior management.

7.      In fact, the Company's senior leadership directly and purposefully encouraged this behavior by imposing unachievable sales quotas on sales employees. According to the Securities Class Action[1] Consolidated Complaint (the "Securities Class Complaint"), the Company's senior management closely monitored and enforced strict compliance with these quotas, and terminated sales employees who did not meet them.

8.      Months later, CenturyLink implemented a significant change to the Company's sales employee performance assessment model specifically intended to address the Company's unethical sales practices. Although the new method was an initial success—with customer complaints and terminations for unethical behavior declining significantly—it was soon followed by a decline in sales. Unwilling to tolerate any drop in revenues, CenturyLink's senior management reverted back to strict quota-enforcement almost immediately. At the same time, certain Defendants continued to receive and review monthly reports detailing the thousands of customer and regulator "cramming" and billing complaints which confirmed the scope and seriousness of the fraud.

_____

[1] The securities class actions were consolidated into a multidistrict consolidated action, *In re: CenturyLink Sales Practices and Securities Litigation*, Case No. 0:17-md-02795, currently pending in the District of Minnesota.

9.     Instead of disclosing the truth—that CenturyLink's cramming practices were a material driver of the Company's revenues, and that efforts to address them had led to a sharp decline in sales—Defendants endorsed a false narrative in an attempt to explain the Company's fluctuating financial results and do damage control. In fact, at the same time, the SEC directly questioned the Company about the adequacy of its disclosures concerning the performance of the consumer segment and the Company flatly denied any material information was omitted — despite the fact that the Company had turned its entire sales operation upside down, and back again, because its revenues were so drastically impacted by the illegal scheme alleged herein.

10.     The Company was not willing to admit a slowdown in sales so Defendants caused the Company to continue the illegal scheme.  As complaints and state regulator and news media investigations escalated, the Company failed to disclose the widespread and systematic fraud and related investigations, and continually denied allegations of improper sales practices.

11.     In May 2016, the Minnesota Attorney General served CenturyLink with a civil investigative demand following scores of complaints by Minnesota customers. While Defendant Post would later attempt to take personal credit for "cooperating with the AG's office since the inquiry began," the Minnesota Attorney General made clear that CenturyLink did everything in its power to quash the investigation and keep CenturyLink's billing practices a secret.

12.     Several months later a CenturyLink whistleblower, Heidi Heiser, brought her complaints over the cramming she witnessed directly to the attention of CenturyLink's CEO, Defendant Post. Specifically, in an online town hall meeting in October 2016, during which Company employees had the opportunity to post questions to an online message board for review by Defendant Post, Heiser asked the CEO "why customers were being given multiple accounts and being billed for things they did not ask for" – again alerting CenturyLink's senior-most

executives to the practices they had previously attempted to address. Consistent with the manner in which the Company treated other employees who challenged CenturyLink's practices, the whistleblower's post was promptly removed, and she was terminated just two days later.

13.     The truth concerning the Company's illegal practices began to be revealed on June 16, 2017, when *Bloomberg* published a story revealing that a CenturyLink whistleblower, Heiser, was fired after raising her concerns about the Company's fraudulent business practices with Defendant Post. That article, titled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," addressed Heiser's account of CenturyLink's practice of charging customers for services they did not request, the striking parallels to the Wells Fargo scandal, and the fact that these practices had led to "many millions" of dollars in improperly recorded revenues. As a result of these revelations, the Company's stock plummeted.

14.     Then, on July 12, 2017, the Minnesota Attorney General announced that it had filed a lawsuit against CenturyLink alleging violations of state consumer protection laws after a year-long investigation. As detailed in the media, the Minnesota Attorney General's complaint, which was posted on its website, provided extensive detail as to how the Company defrauded Minnesota consumers by refusing to honor the prices they were quoted. Among other things, the complaint cited internal Company employee emails and call recordings detailing that "maybe 1 out of 5 [customers] are quoted correctly or close enough." The details provided in the Minnesota Attorney General's complaint also further revealed the financial impact of the Company's fraudulent practices—documenting scores of instances where customers were charged hundreds of dollars more than they should have been.

15.     Shortly after CenturyLink responded to several questions from the SEC about its consumer segment disclosures former director and audit committee member Joseph Zimmel

("Zimmel"), was ousted from the Board under suspicious circumstances. The public only learned about the background concerning his removal because Zimmel forced the Company to disclose it. Zimmel was forced off of the Board just weeks after the Company responded to the SEC's inquiry questioning the bases for the consumer segment's operating performance. And Zimmel himself said his forced departure, and the Board's handling of the matter, "raised serious governance, transparency and honesty issues" and that the Company attempted to portray those events to the investing public in an "incomplete[,] inaccurate[,]" and "deliberately misleading" way.

16. CenturyLink's illegal billing practices are now the subject of investigations by state Attorneys General around the country, the Company has been forced to adopt changes to address the cramming practices that undergirded the Company's reported growth, and CenturyLink's revenues have stalled as a result.

17. Defendants had a fiduciary duty to install and maintain internal controls in order to comply with and prevent violations of the law. The Company is currently facing massive exposure due to Defendants' illegal actions. Plaintiff brings this action on behalf of the Company to, among other things, recover damages including but not limited to, fees, costs, loss of goodwill and business opportunities, as well as loss in market value and shareholder equity, caused by the Individual Defendants' unlawful courses of conduct and breaches of fiduciary duty.

18. As a result of the Board's actions, the Company has already suffered, and will continue to suffer, substantial financial damage. The Company is now threatened with serious regulatory investigations, which may result in criminal indictments and/or civil enforcement actions. The investigations and litigation pending against the Company can cost a company hundreds of millions of dollars in legal fees and fines, as well as years of wasted executive time in dealing with the allegations and remedying the wrongful conduct.

19.     The Company is currently facing massive exposure due to Defendants' illegal scheme that have resulted in numerous lawsuits against the Company, including but not limited to, several securities class actions, numerous investigations by various state Attorney Generals, an action brought against the Company by the Minnesota Attorney General, and a whistleblower lawsuit by a CenturyLink employee who was wrongly terminated after she attempted to alert Defendants of the Company's illegal practices.   Despites these facts and an investigation by a Special Litigation Committee, the Board has taken no action, and in fact, disbanded the Special Litigation Committee which was charged with investigating the allegations herein.

20.     Specifically, despite the fact that the Special Litigation Committee was purportedly engaged in investigating defendants' misconduct, the Board has failed, *inter alia*, to do the following: (a) issue any reports of the Special Litigation Committee's purported findings; (b) terminate anyone in connection with the Special Litigation Committee's findings; (c) recoup any performance-based compensation paid to defendants during the Relevant Period; or (d) recoup any severance or retirement benefits from certain Defendants.   This clearly demonstrates that the purported Special Litigation Committee was a mere sham and did nothing to protect the Company and limit its massive exposure.   In sum, during the entire existence of the Special Litigation Committee, which has now been "formally disbanded" despite the Company's massive exposure, it took no action resulting from its purported "investigation."

21.     Since the Company remains under the control and/or influence of the primary wrongdoers who: (1) have substantial conflicts and/or (2) may be implicated in the commission of the illegal conduct alleged herein, CenturyLink is unable to protect itself or remedy the wrongs inflicted upon it.   Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company for, among

other things, the costs and expenses that have, and will be paid, by the Company as a result of Defendants' wrongdoing.

## JURISDICTION AND VENUE

22.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

23.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

24.    Venue is proper in this District because a substantial portion of transactions and wrongs complained of herein occurred in this District.  Defendants either reside in or maintain executive offices or participated in board meetings in this district and have received substantial compensation in this District by engaging in numerous activities and conducting business here.

## PARTIES

### Plaintiff

25.    Plaintiff is, and at all relevant times was, a shareholder of CenturyLink.   Plaintiff is an Illinois corporation with its principal place of business located at 800 W Hutchinson Street, Chicago, Illinois 60613.

### Nominal Defendant

26.    Nominal Defendant CenturyLink is a Louisiana corporation headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203.

### The Individual Defendants

27.    Defendant Jeff Storey ("Storey") has served as CenturyLink's President and Chief Executive Officer ("CEO") since May 2018 and has served as a director since November 1, 2017. Defendant Storey also served as President and Chief Operating Officer ("COO") of the Company

following its acquisition of Level 3.  Storey is a member of the Risk and Security Committee.

Upon information and belief, Storey is a citizen of the State of Colorado.

28.     Defendant Martha H. Bejar ("Bejar") has been a director since January 2016.  Bejar

is a member of the Audit and Risk and Security Committees.  Upon information and belief, Bejar

is a citizen of the State of Washington.

29.     Defendant Virginia Boulet ("Boulet") has been a director since 1995.  Boulet is the

Chair of the Nominating and Corporate Governance Committee and a member of the Human

Resources and Compensation Committee.  Upon information and belief, Boulet is a citizen of the

State of Louisiana.

30.     Defendant Peter C. Brown ("Brown") has served as a director since July 1, 2009.

Brown is a member of the Audit Committee.  Upon information and belief, Brown is a citizen of

the State of Missouri.

31.     Defendant Kevin P. Chilton ("Chilton") has served as a director since November 1,

2017.  Chilton is a member of the Audit Committee and Chair of the Risk and Security Committee.

Upon information and belief, Chilton is a citizen of the State of Colorado.

32.     Defendant Steven T. Clontz ("Clontz") has served as a director since November 1,

2017.  Clontz is a member of the Human Resources and Compensation Committee and the

Nominating and Corporate Governance Committee. Upon information and belief, Clontz is a

citizen of the State of Florida.

33.     Defendant W. Bruce Hanks ("Hanks") has served as a director since 1992.  He is

the Chair of the Audit Committee.  Upon information and belief, Hanks is a citizen of the State of

Louisiana.

34.    Defendant Mary L. Landrieu ("Landrieu") has served as a director since November 2015.  Landrieu is a member of the Nominating and Corporate Governance Committee and Risk and Security Committee.  Upon information and belief, Landrieu is a citizen of Washington, D.C.

35.    Defendant Harvey P. Perry ("Perry") has been a director since 1990.  Since May 2017, Perry has served as non-executive Chairman of the Board of Directors of CenturyLink. Perry joined CenturyLink in 1984, serving as Secretary and General Counsel at CenturyLink for approximately twenty (20) years and as Executive Vice President and Chief Administrative Officer for almost five (5) years. Perry is a member of the Risk and Security Committee.  Upon information and belief, Perry is a citizen of the State of Louisiana.

36.    Defendant Glen F. Post, III ("Post") has served as a director since 1985 Post served as Chief Executive Officer of CenturyLink from 1992 to May 2018 and as President of CenturyLink from 1990 to November 1, 2017 (except for 2002 to 2009).  Post served as Chairman of the Board of CenturyLink from 2002 to 2009 and as Vice Chairman of the Board of CenturyLink from 1993 and 2002.  Post has also held various other positions at CenturyLink between 1976 and 1993, most notably Treasurer, Chief Financial Officer and COO.  Post is a member of the Risk and Security Committee. Defendant Post is a named defendant in the Securities Class Action. Upon information and belief, Post is a citizen of the State of Louisiana.

37.    Defendant Laurie A. Siegel ("Siegel") has served as a director since July 1, 2009. Siegel is the Chair of the Human Resources and Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Upon information and belief, Siegel is a citizen of the State of New Jersey.

38.    Defendant T. Michael Glenn ("Glenn") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, Glenn was a

director at Level 3. Glenn is a member of the Audit Committee and the Human Resources and Compensation Committee. Upon information and belief Defendant Glenn is a citizen of Tennessee.

39.    Defendant R. Stewart Ewing, Jr. ("Ewing") was, at all relevant times, the CFO and Executive Vice President of CenturyLink. Ewing resigned his post shortly after CenturyLink closed its acquisition of Level 3 on November 1, 2017. Upon information and belief, Ewing is a citizen of the State of Louisiana.

40.    Defendant David D. Cole ("Cole") was, at all relevant times Executive Vice President and Controller of CenturyLink, and served as the Company's principal accounting officer during the Class Period. On March 27, 2018, Cole informed the Company of his decision to step down from the Company effective April 8, 2018. Upon information and belief, Cole is a citizen of the State of Louisiana.

41.    Defendant Karen Puckett ("Puckett") spent fifteen (15) years at CenturyLink until the Company unexpectedly announced her departure on June 2, 2015. From 2009 through October 2014, Puckett served as CenturyLink's Executive Vice President and COO. From November 2014 until she left the Company in August 2015, she served as CenturyLink's President of Global Markets. During the Class Period, Puckett was the highest ranking executive with direct oversight of the consumer segment sales division. Upon information and belief, Puckett is a citizen of the State of Texas.

42.    Defendant Dean J. Douglas ("Douglas") took over Defendant Puckett's role after her departure. He began his employment at CenturyLink as President, Sales and Marketing in February 2016, and was later named President, Enterprise Markets. On April 28, 2017, CenturyLink disclosed that Douglas would be a member of the "senior leadership" team reporting

to Post after the Level 3 merger closed and, on June 1, 2017, confirmed certain executive compensation that Douglas would receive in connection with that role in a Form 8-K filed with the SEC. However, less than two months later, following the disclosures of the Company's widespread cramming practices alleged herein, on June 22, 2017, CenturyLink disclosed that Douglas had "decided to leave the company at the close of the Level 3 transaction."  Upon information and belief, Douglas is a citizen of the State of Florida.

43.    Defendant G. Clay Bailey ("Bailey") served as the Company's Senior Vice President and Treasurer and, as such, had significant involvement in the Company's financial affairs and, under the Company's bylaws, had general custody of all of the funds and securities of the Company and authority to sign all bills of exchange or promissory notes of the Company. In 2014, Defendant Bailey served as CenturyLink's Senior Vice President of Operations with oversight over "all [CenturyLink's] region operations." Previously, Defendant Baily served as the lead of the Company's Regulatory and Legislative teams at both the state and federal levels, and served as a spokesperson for the Company in its interactions with regulators. Upon information and belief, Bailey is a citizen of the State of Louisiana.

44.    Defendant Sunit S. Patel ("Patel") served as the Company's CFO and Executive Vice President from November 2017 until his resignation effective September 28, 2018. Upon information and belief Defendant Patel is a citizen of Colorado.

45.    The above named Defendants are collectively referred to herein as "Defendants" or the "Individual Defendants."

**Fiduciary Duties Owed to The Company**

46.    By reason of their positions as officers and/or directors of CenturyLink during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed CenturyLink and its shareholders fiduciary obligations

of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CenturyLink and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of CenturyLink, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with CenturyLink, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

48.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of CenturyLink were required to, among other things:

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

49.     According to CenturyLink's Code of Conduct[2], which is applicable to "[a]ll employees, officers and directors of CenturyLink", all of the Defendants have a duty to make sure that the Company's financial reporting is accurate and free from false or misleading information. The Company's Code of Conduct states in relevant part:

**Each of us has a duty to ensure that all entries in our Company's financial records give an honest picture of the results of our operations and our financial position.** We do this by complying not only with our Company's policies, but also with the laws, rules and regulations that govern our financial accounting and reporting. In particular, this means that we must:

- Accurately record all assets, liabilities, revenues and expenses
- Follow all internal control procedures
- Never make false or artificial journal entries
- Never establish unsupported reserves or accruals

**Our senior financial officers – including, but not limited to, our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer – have additional responsibilities. They must ensure that the financial information we disclose in public communications and file in the Company periodic reports with the Securities and Exchange Commission ("SEC") is full, fair, accurate, timely and understandable.** In addition, senior financial officers are required to:

- Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports in accurate
- **Inform the Disclosure Committee of transactions, events or circumstances that could have a material impact on our Company's financial reports**

---

[2] CenturyLink Code of Conduct, https://www.centurylink.com/asset/aboutus/downloads/governance/ethics/CenturyLink%20Code%20of%20Conduct.pdf (Last visited December 19, 2018)

- Fairly and accurately represent material facts or circumstances when interacting with our auditors and those individuals who prepare our Company's financial statements
- Ensure that those who perform accounting or financial reporting functions know and adhere to these principles

All of us, including our senior financial officers, must immediately report accounting or auditing irregularities. In addition, we must report the following:

- Any violation of any law, rule or regulation
- Any incidence of fraud, whether or not material, by any person, including those with accounting or financial reporting responsibilities in connection with financial disclosures or reports
- **Any material information, including any deficiency in our internal controls, that could affect or render untrue the information contained in our public communications or periodic reports filed with the SEC or other regulatory body**

These matters will be reported to the Audit Committee in accordance with Company policies, procedures, legal requirements and stock exchange listing standards.

(emphasis added).

Thus, all Defendants owed the Company and its shareholders duties of due care, loyalty and good faith to disclose material facts to shareholders during the Relevant Period.

50.    Defendants Brown, Chilton, Hanks, and Glenn were, during the Relevant Period, members of the Audit Committee of the Company's Board of Directors. The Audit Committee's primary function is, by its Charter[3]:

[T]o assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by (1) overseeing the Company's system of financial reporting, auditing, controls and legal compliance, (2) monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures, (3) monitoring the qualifications, independence and performance of the outside and internal auditors and (4) providing related oversight functions.

---

[3] CenturyLink, Inc. Charter of the Audit Committee of the Board of Directors (as amended through August 22, 2018), available at https://www.centurylink.com/asset/aboutus/downloads/governance/board-committees/CTL%20-%20Charter%20the%20of%20Audit%20Committee%20of%20Board%20of%20Directors%20(N0932823-15x7A3A0).pdf, (last visited December 19, 2018)

Thus, the Audit Committee was responsible for overseeing and directly participating in the Company's financial reporting process and owed the Company and its shareholders duties of due care, loyalty and good faith.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and Its Growth Through Acquisitions

51.     CenturyLink is the third largest telecommunications company in the United States, and provides a wide variety of telecommunication, internet, and similar services to approximately 12 million customers. The Company's main offerings include local and long-distance telephone services, broadband internet access, and video services. Although CenturyLink changed its reporting segments at certain points during the Relevant Period, the Company's consumer segment was, at all times, a major driver of the Company's financial success. The consumer segment accounted for a third or more of the Company's revenues during the Relevant Period, or up to $6 billion or more annually, and was a central focus for CenturyLink's investors.

52.     Although it was not separately reported, CenturyLink's Small and Medium Business ("SMB") sales also served as a significant source of revenue for the Company.

53.     Throughout the Relevant Period, CenturyLink touted its alleged superior "customer-first" approach as a key distinguishing feature and a driver of the Company's success.

54.     Through a series of acquisitions, including the Company's $11.6 billion acquisition of Embarq in July 2009, its $24 billion acquisition of Qwest in April 2011, and its $2.5 billion acquisition of Savvis in July 2011, CenturyLink had grown to become the third largest telecommunications provider in the United States by the beginning of the Relevant Period. During this period of extraordinary growth, the Company repeatedly told investors that its success would be based on providing a superior "customer experience" relative to its competitors. Specifically, the Company told investors that CenturyLink would grow revenues and add subscribers through

its superior "marketing strategy" and "customer care system," all while maintaining strict adherence to the Company's Unifying Principles, including "fairness, honesty and integrity." According to CenturyLink, these were the key "differentiators" that were the basis for the Company's success. As CenturyLink claimed, "our employees keep our customers at the center of everything we do."

55.    CenturyLink also told investors that its "customer first" business model would enable the Company to grow revenues in the markets where Embarq and Qwest had previously competed, but had fallen short. For example, Defendant Ewing, CenturyLink's then-CFO, told investors that CenturyLink would be able to leverage is superior "customer service and marketing efficiencies" to grow revenues in markets previously served by Embarq by changing "what they've been doing from a marketing standpoint and [using] the approach that we're using." Similarly, Defendant Post, CenturyLink's then-CEO, explained that the Company would "drive revenues and to create synergies in the Embarq areas" by deploying CenturyLink's IT and "billing systems, [which] we think [will] create a better customer experience and reduce costs significantly from a customer service standpoint." Immediately after the Embarq acquisition closed in July 2009, CenturyLink began to highlight the revenues the Company was generating from its superior marketing capabilities. For example, during the Company's November 5, 2009 third-quarter conference call, Defendant Post said this strategy was "going very well" and "already making a difference" due to the change to "local market focus." As Post explained:

> We have implemented our aggressive Broadband strategy and Embarq market in the third quarter. And among a number of things this effort included consumer promotional pricing for high-speed internet and the targeting of non-customers with our Pure Broadband products. It has proven very successful and obviously contributed to our Broadband customer growth during the quarter.

56.    CenturyLink crafted a public image as an honest steward of its telecommunications infrastructure by repeatedly claiming that it met and exceeded the customer service standards and

consumer protection laws governing its business. During the Relevant Period, CenturyLink was subject to significant regulation by the Federal Communications Commission (the "FCC"), which regulates interstate communications, state utility commissions, which regulate intrastate communications, and other regulators that enforce rules to protect consumers and promote competition.

57.     One critical set of regulations designed to protect consumers from unscrupulous sales and billing conduct targets a practice known as "cramming." "Cramming" refers not only to the situation in which a customer is charged for a service he or she did not authorize or request, but also encompasses other improper practices in which customers are not properly informed of the terms or conditions of services. For example, the FCC defines "cramming" as "placing unauthorized, misleading or deceptive charges on a consumer's telephone bill" or failing to "clearly or accurately describe all of the relevant charges when marketing a service." Many states and municipalities have enacted legislation specifically outlawing cramming.

58.     The illegal practice of cramming became a prominent concern of the public prior to the Relevant Period. In May 2010, Senator John D. Rockefeller IV, the then-Chair of the Senate Committee on Commerce, Science, and Transportation (the "Senate Committee"), opened an investigation to examine the extent of third-party cramming. That investigation culminated in a July 12, 2011 Senate Committee report that found, among other things, that AT&T, Verizon, and Qwest (which CenturyLink acquired in April 2011) had reaped more than $650 million from third-party billing.[4]

---

[4] U.S. Senate Committee on Commerce, Science, and Transportation, Staff Report on Unauthorized Third-Party Charges on Telephone Bills (July 12, 2011).

59.    During the Senate Committee's investigation, CenturyLink sought to distance itself from third-party cramming and to assure regulators that its billing practices were appropriate. For example, in an October 24, 2011 submission to the FCC addressing cramming, CenturyLink highlighted the purported integrity and rigor of the Company's processes relating to third-party billing. Among other things, the Company told the FCC that it "monitors customer inquiries and complaints" about third-party billing and that the Company's "customer inquiry and complaint process focuses on customer satisfaction." According to the Company, "CenturyLink has a customer-friendly dispute resolution process to address complaints about alleged cramming."

60.    Thereafter, in order to avoid further governmental oversight of its actual billing practices, CenturyLink repeatedly highlighted its "voluntary" move to remove third-party billing in an attempt to distinguish itself from competitors, presenting the false impression to investors and regulators that the Company engaged in ethical and transparent billing practices.  For example, in a June 25, 2012 submission to the FCC, CenturyLink argued that the proposed rules were unnecessary because CenturyLink had already agreed to limit third-party billing. In doing so, CenturyLink highlighted its purported commitment to its customers, explaining that "CenturyLink values our customers and seeks to treat them fairly and equitably in our delivery of products and services, including billing." Similarly, in a November 18, 2013 response to the FCC for further comment on the proposed rules, CenturyLink portrayed itself as an industry leader in combatting cramming practices:

> CenturyLink values our customers and seeks to treat them fairly and equitably in our delivery of products and services, including billing. And we share the Commission's goals of ensuring consumers are not subjected to unauthorized third-party charges. In that vein, CenturyLink determined mid- summer 2012 to reduce the scope of our third-party billing services, essentially foregoing most third-party enhanced-services billing….
>
> Our decision to reduce third-party billing activities was shared by other major U.S. wireline providers. And those billing reductions became operative coincident with

additional regulations associated with the Commission's 2012 Cramming Order. The combination of these activities, we believe, has produced an environment associated with wireline carrier third-party billing that does not warrant additional government intervention.

61. CenturyLink also specifically agreed to abide by consumer protection standards throughout the country in representations to the FCC and to state and local authorities. Under the 1992 Cable Act, the FCC promulgated consumer protection standards in connection with cable television service, and empowered local authorities to enforce the FCC's standards and to promulgate their own, stricter standards. The FCC's standards – the very baseline CenturyLink was required to meet – required CenturyLink to, among other things, give subscribers 30 days' advanced notice of any changes in rates, promptly issue refunds and credits for overcharges, and promptly answer customer calls. As CenturyLink expanded its provision of cable services, the Company entered into numerous franchise agreements with local authorities in which it agreed to abide by the FCC standards, or even stricter rules.

62. CenturyLink was also required to comply with consumer protection laws in the states where the Company conducted business, as well as similar rules enforced by the Federal Trade Commission ("FTC"), the Consumer Financial Protection Bureau and state Attorneys General. In fact, every year during the Relevant Period, Defendant Cole personally certified under penalty of perjury that he was "familiar with the Company's day-to-day operations" and the applicable "consumer protection rules" governing CenturyLink's business, and affirmed that the Company was "complying with applicable service quality standards and consumer protection rules," including those prohibiting the "unauthorized switching to another telecommunications provider and unauthorized inclusion, or addition of services, commonly known as slamming and cramming," in 35 states and over 100 jurisdictions.

21

63.    Government enforcement of these consumer protection laws took on particular significance during the Relevant Period. Beginning in the fall of 2014, the FTC and attorneys general from all 50 states pursued claims and obtained multimillion-dollar settlements from AT&T and T-Mobile for illegal third-party cramming. In the AT&T case, which settled for $105 million, the government alleged that customers had requested refunds of more than 40% of the charges placed by some third parties – which should have rung "alarms inside AT&T" – but AT&T refused to refund the amounts, capping any refunds at only two months' worth of charges no matter how long the customer had been improperly charged. These public enforcement actions put Defendants on notice regarding the significant consequences that the Company's illegal cramming would invite.

64.    For this reason, CenturyLink itself repeatedly told investors that compliance with these laws and regulations was critical to the Company's success, and that the consequences of noncompliance would be highly material. In SEC filings prior to and throughout the Relevant Period, CenturyLink represented that it faced hypothetical risks in connection with the high level of regulatory oversight it experienced. For example, in the Company's 2013 Annual Report filed with the SEC on February 27, 2014, CenturyLink warned that the Company was subject to "significant" regulations by the FCC and state utility commissions, that the "agencies responsible for the enforcement of these laws, rules and regulations may initiate inquiries or actions based on customer complaints or on their own initiative," and that such actions could "have a material adverse effect on our operations." In other words, the Company told investors that noncompliance with consumer protection laws was a mere "risk"—not that this risk was likely materialize.

65.    Among other things, the Company published on its website, a Code of Conduct. CenturyLink acknowledged the importance of complying with laws and regulations governing its

customer interactions, and claimed to adhere to certain proscriptions on unethical conduct. Pursuant to the Code of Conduct, CenturyLink assured investors that the Company would be "truthful and demonstrate integrity in all our dealings," "[n]ever encourage or direct employees to achieve business results at the expense of ethical conduct or compliance with the Code or the law," and "truthfully market, promote, advertise and sell our products" – a requirement that was part of the Company's "commitment to act honestly in all business affairs." Specifically, with regard to customer interactions, the Code assured investors that "[a]ll descriptions of our products, services, and prices must be truthful and accurate," and the Company would not "misstate facts or mislead consumers through Company advertisements or promotions." Most significantly, the Code stated that the Company would not "engage in unethical or deceptive sales practices," including "plac[ing] or record[ing] an order for our products and services for a customer without that customer's authorization."

66.     CenturyLink touted its Code of Conduct in SEC filings throughout the Relevant Period. For example, CenturyLink's 2014 Form 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC." Based on these statements, the Company assured investors that they could take comfort in the Company's sales practices and the accuracy of its public disclosures.

67.     Not only did the Company tout its purported compliance with the laws governing CenturyLink's sales practices, CenturyLink told investors that those sales and marketing practices would help it combat structural challenges facing the Company's business. CenturyLink's core business was historically focused on providing local and long distance telephone service – which the Company called "legacy services." But by the beginning of the Relevant Period, those services were in severe structural decline because, as the Company explained in its 2014 Form 10-K, "an increasing number of consumers are willing to substitute cable, wireless and electronic communications for traditional voice telecommunications services."

68.     Immediately before the Relevant Period, investors were alerted to just how significant a threat this trend posed to the Company's long-term financial health. Specifically, just before the beginning of the Relevant Period, CenturyLink announced a massive 25% dividend cut—a move that Defendant Post said was prompted by rating agencies' concerns about the Company's ability to service its debt. The market reacted severely to this development, which sparked concerns over the Company's financial health and led numerous analysts to downgrade the Company's stock, which fell 22.6% on the announcement.

69.     To counter the structural decline in wireline services and reassure investors about the Company's ability to continue generating the cash flows required to fund its dividend, CenturyLink began to focus on selling what it termed "strategic services," which included consumer broadband, cable television, and similar newer technologies. As Defendant Post explained, the Company's "strategic priorities" included increasing sales of "consumer broadband and video" as a key to driving "long-term profitable growth and value for our shareholders." The Company's ability to successfully grow these business lines and return to "revenue stability" was

of critical importance to investors – indeed, it was a focus of every conference call during the Relevant Period.

70.     In fact, throughout the Relevant Period, Defendants repeatedly highlighted the marketing and sales strategies the Company purportedly used to grow new subscribers, prevent customers from leaving, and increase sales—and falsely credited these practices as responsible for CenturyLink's reported revenues. Specifically, the Company told investors that one of its key marketing initiatives involved selling these services as "bundled" packages, in which consumers bought more than one of voice, data, and video products as a single package. Defendants regularly explained that customers who purchased bundles were less likely to "churn," or leave the Company for a competitor, than were customers who only purchased a single product. This marketing approach was highlighted in the Company's SEC filings throughout the Relevant Period, in which CenturyLink explained that "[o]ur strategy is to enhance our communications services by offering a comprehensive bundle of services…to further enhance customer loyalty."

71.     On an August 3, 2016 conference call, Defendant Douglas explained that the Company's ongoing "shift" to targeting "bundled customers" drove "better ARPU," or "average revenue per user," as well as a "longer lifetime revenue base for that customer." According to Douglas, the Company was seeing "churn level for our pure customers, or standalone high-speed customers" that was "double that of what we're seeing in those bundled customers," explaining this signified a "very, very significant churn rate in those [pure, non-bundled] customers." Defendants touted the Company's ability to cross-sell products as a reason for optimism about CenturyLink's revenue prospects throughout the Relevant Period.

**CenturyLink's Revenues Were Secretly Driven By An Illegal Scheme Involving Sales Cramming Practices**

72.    Defendants' representations touting the Company's "customer first" focus, superior customer service approach, and legal compliance were false. In reality, fraudulent and illegal sales practices were at the very core of the Company's business model and practices.

73.    During the Relevant Period, CenturyLink implemented a boiler-room sales apparatus in which intense pressure was exerted on sales personnel – including employees in so-called "customer service" positions – to bill for CenturyLink products and services without regard to whether customers wanted or requested them. This pressure took the form of impossibly high sales quotas, which employees were required to meet under threat of termination, as well as rewards and incentives for generating sales regardless of how they were obtained. Under this constant pressure, customer service employees turned to deceptive practices to hit their numbers, including cramming, misquoting prices, and falsification of contracts. Indeed, some of the deceptive sales pitches CenturyLink used were developed by Company managers and discussed at monthly sales meetings.

74.    To ensure that the Company kept as much revenue from these improper charges as possible, CenturyLink established a "customer service" apparatus staffed by hundreds of call center representatives who were coached on how to "save" sales and given strict limits on the amount of "credits" they could issue to customers who had been improperly billed. Defendants knew or should have known through regular reporting, that these rules and incentives led to illegal cramming.   As set forth in detail below, CenturyLink engaged in the following illegal and deceptive "cramming" practices:

- Misquoting and deceiving customers concerning the prices they would be charged, including by misrepresenting or omitting key promotional terms. As reported by former employees detailed in complaints filed by the Arizona and Minnesota Attorneys General, CenturyLink routinely

represented that a customer would be charged one price for a particular service but would in fact be charged another.

- Misleading customers about other material terms. CenturyLink omitted and concealed highly material contract terms or misled customers concerning significant limitations on their service. As reported by former employees, one established, companywide and management-endorsed practice involved quoting a customer a price without disclosing that the price included additional fees for optional services.

75.    These illegal and deceptive practices had a material, undisclosed effect on the Company's financial condition. As was revealed after the end of the Relevant Period, these practices resulted in CenturyLink potentially "over-bill[ing] more than 3.5 million customers"—a number representing over half of CenturyLink's 5.9 million broadband subscribers and one-third of its 12 million wireline customers.

**CenturyLink's Senior Management Imposed Sales Quotas That Could Not Be Met Without Engaging In The Illegal Scheme**

76.    CenturyLink's billing misconduct was driven by the sales quota system that CenturyLink put in place to meet the ambitious revenue targets that the Company promised Wall Street.

77.    The Securities Class Complaint details the following accounts:

a.    According to a former employee ("FE-1") of CenturyLink[5], sales quotas were based on revenue targets that would be set by senior management during annual meetings. Once the revenue targets were determined, the marketing department would figure out which and how many products needed to be sold to hit those targets – *i.e.*, how many high speed internet

---

[5] According to the Securities Class Complaint, Former Employee 1 ("FE-1 ") worked at CenturyLink for approximately 18 years as a Manager of Customer Care and Sales in the Southeastern United States until February 2018. All references and information from former employees are taken from the Securities Class Action and are alleged herein under information and belief.

connections, Prism TV subscriptions, access lines, etc. Those figures would then be given to Linda Olsen, and she and other directors would divvy up the units by head count and assign quota numbers to each call center. According to FE-1, the quotas were based on the revenue projections that management had set – not on what the Company's sales force historically achieved. As FE-1 explained, "it was all revenue driven" and did not "make sense" based on prior sales. However, according to FE-1, CenturyLink's senior management had no interest in looking at any analytics that would take prior sales experience, or any other factors, into account. At CenturyLink, FE-1 said, the "number was the number."

       b.      Former Employee No. 2 ("FE-2"), who worked in Financial Planning and Analysis as a Financial Analyst II from April 2013 through April 2016, confirmed that revenue projections would be presented to the Company's executives, including Defendants Post, Ewing, Cole, and Puckett, by FE-2's boss. The Company executives would then sign off on the projections, and those numbers became the working plan. FE- 2, who worked on revenue forecasting and variance analyses for PrismTV, among other things, said that once the Company started receiving the actual numbers, a new analysis was run and the outlook would be updated every quarter, and Company's executives, including Defendants Storey, Ewing, Cole, Puckett, Douglas, Bailey, Post, and Patel, received these updates. According to FE-2, CenturyLink's revenue forecasts were often out of whack. As FE-2 explained, "[a]t times I'd get unit projections and would think, 'Are we really going to do this?' Just looking at what we had done [historically] it was always mind blowing. In a market where we'd never sold over 1,700 units, all of a sudden we're going to push 2,500 units next month."

       c.      Former Employee No. 15 ("FE-15"), who worked as a Regional President in the Southern United States from 2009 through 2014, explained that CenturyLink's marketing

strategy involved trying to compete with cable companies and other providers on price—but then charge fees, terms and charges to help the Company recover the revenue lost by keeping the price point low. FE-15 recalled that, in 2014, "there was a big push to keep the price point low but add fees," and FE-15 discussed this strategy in meetings with Defendant Puckett and Defendant Bailey. FE-15 repeatedly voiced concerns about it, particularly to Defendant Puckett, but was told FE-15's approach was too naïve.

        d.      According to former CenturyLink sales representatives, the sales quotas established by CenturyLink senior management were impossible to meet without committing fraud. For example, Former Employee No. 3 ("FE-3"), an inbound call center sales representative who worked at CenturyLink from April 2010 through December 2013, confirmed that the Company encouraged deceptive sales practices by having "ridiculous" sales quotas for the numerous products CenturyLink offered. As FE-3 explained, monthly quotas required customer service representatives to sell approximately 20 TV subscriptions, 30 internet subscriptions, 20 regular phone lines, and a certain number of long distance plans, as well as added features like LineGuard, Caller ID, three-way calling and @Ease.  FE-3 said that the sales quotas were unreasonable, and did not reflect what employees who were dealing honestly with customers could be expected to sell.

        e.      Former Employee No. 4 ("FE-4"), who worked as a CenturyLink Inbound Sales and Care Representative from March 2014 through January 2015, similarly confirmed that CenturyLink's monthly sales quotas were "insane" and strictly enforced. Indeed, failure to hit the sales quotas for three months in a row was the reason FE-4 was terminated from CenturyLink. FE-4 explained that CenturyLink's quotas included selling approximately 30-40 phone lines and bundles per month; 25-35 internet subscriptions per month; and seven to 10 television

subscriptions per month. FE-4 said that, for in-bound call representatives, these quotas were difficult to meet because most customers were calling in to complain about their bills and wanted to disconnect their service not purchase additional ones. However, according to FE-4, this is what CenturyLink expected inbound call representatives to do: sell additional products and services to complaining customers. FE-4 said that sales representatives were told that they had 10 minutes per call to figure out the customer's problem, resolve it, and then make a sale.

   f.  Similarly, Former Employee No. 5 ("FE-5"), who worked as a Consumer and Business Sales Manager in Boise, Idaho from February 2009 through June 2016, said that CenturyLink sales employees repeatedly talked about how "crazy" the Company's quotas were. According to FE-5, the Company continued to steadily increase the sales goals throughout his tenure and, based on interactions with call center employees, it was clear that "their sales goals were so ridiculously high you had to cheat to get your numbers." Likewise, according to Former Employee No. 6 ("FE-6"), who worked as an Inbound Sales Representative from April through September 2015 and sold internet and cable services to residential customers, the sales quotas were "impossible to hit unless you were engaged in shady practices."

**CenturyLink Strictly Enforced Senior Management's Excessive Sales Quotas By Disciplining and Terminating Employees Who Did Not Meet Them**

   78.  CenturyLink's billing misconduct was perpetuated through the strict, punitive enforcement of the sales quotas senior management imposed. The Securities Class Complaint notes the following:

a.    As confirmed by FE-1, FE-5, Former Employee No. 7 ("FE-7"),[6] and Former Employee No. 8 ("FE-8"),[7] CenturyLink's quotas for sales representatives were enforced as follows: In the first month an employee missed his or her sales goals, he or she would be put on a "documented discussion," a formal discussion with a supervisor that was the first disciplinary step. If the employee missed a sales goal for two months in a row, he or she would receive a written warning; if sales goals were missed for three months there was a formal warning of dismissal; and if goals were missed four consecutive months, the employee would be fired. As FE-5 explained, as the Company raised sales quotas, the monthly targets were harder to meet, which led to sales representatives to "store" any sales in excess of the monthly quota, and then post-date those sales so they would appear on the next month's statistics.

b.    CenturyLink senior management closely monitored compliance with sales quotas, and discussed disciplining sales representatives who missed them every month. As FE-8 explained, Olsen (CenturyLink's Director of Inbound Sales and Care), the relevant director and manager from each of CenturyLink's call centers, and an HR Business Partner would hold monthly calls to discuss employee sales performance and discipline—including how many representatives missed their targets, the status of the disciplinary action for those individuals, and what the next disciplinary step would be. In those meetings, Olsen and the HR Business Partners would review a spreadsheet that had a tab for each call center, and rows for each of the employees at each center. The spreadsheet rows would turn red if an employee did not hit their numbers. The excel sheet also included notes for the disciplinary actions taken for poor sales performance, as well as detailed

---

[6] According to the Securities Class Complaint, FE-7 worked as a Customer Care & Sales Supervisor from 2010 to 2018 in the Midwestern United States.

[7] According to the Securities Class Complaint, FE-8 worked as a Lead HR Business Partner from 2012 until 2016.

information concerning the performance of each representative (including gross revenue, revenue per order, revenue per call, calls per hour, and revenue per hour). In fact, according to FE-8, most Company personnel – including the Company executives (including Defendants Storey, Ewing, Cole, Puckett, Douglas, Bailey, Post, and Patel) – had access to a dashboard system that provided nearly up-to- the-minute data on sales and revenues, including employee-level information. The workbooks would reflect this effectively "real time" data, and would also include notes on any disciplinary action taken for cramming.

        c.     As FE-3 explained, the high employee turnover rate at the Company illustrated that the quotas were unobtainable – about 15 to 30 new employees were brought in every other month, maybe a third would be with the Company three months after training. After three years, FE-3 was the eighth-most senior employee in a 60-employee call center. FE-3's own experience at CenturyLink illustrates just how unreasonable the quotas were.  In 2012, FE-3 was named a Circle of Excellence honoree, meaning that her/his sales were in the top 1% of the Company and s/he had a picture taken with Defendant Post. However, the following year, when FE-3 was responsible for selling PrismTV, s/he was terminated for failing to meet CenturyLink's monthly quotas.

        d.     Significantly, CenturyLink sales representatives were not the only employees accountable for meeting quotas – call center supervisors, managers and directors were as well. Former Employee No. 9 ("FE-9"), who worked at CenturyLink from 2002 through 2016, including as a Residential Customer Service Representative and as a National Order Help Desk ("NOHD") Representative in the Midwestern United States, explained that this environment not only drove unethical behavior, but a tendency for call center managers not to do anything about it.

Although supervisors could terminate employees for unethical conduct, there was no reason to do so because of the need to hit quotas.

e.     CenturyLink's sales goals were enforced even when, as inevitably occurred, doing so resulted in a majority of sales employees being disciplined. According to FE-8, for about seven months in a row in 2014, over half of all employees would have been written up for failing to meet the monthly quota. Similarly, FE-1 similarly estimated that about 70% to 80% of all sales agents could be in corrective action at one time.

f.     But at CenturyLink, the quotas were never adjusted. FE-7 said that when he questioned Olsen about strict enforcement of sales quotas, she responded: "That's our culture. If you don't get to 90% [of your quota], we're going to churn to the next person."

g.     The sales quotas imposed by CenturyLink, and the punitive manner in which they were enforced, contrasted sharply with the practices at the predecessor companies that CenturyLink acquired. For example, Former Employee No. 10 ("FE-10"), who began her/his career at Embarq and then worked at CenturyLink in the NOHD in the Southern United States from July 2009 through December 2016, said the sales culture changed dramatically after CenturyLink took over: "It became totally toxic." According to FE-10, "CenturyLink only cared about profits."

**CenturyLink Managers Instructed Employees on the Deceptive Sales Pitches that Sales Representatives Would Use to Cram and Continue the Illegal Scheme**

79.     The Securities Class Complaint set out details confirming the Company's management not only encouraged cramming through its aggressive quotas, but also specifically instructed sales representatives to use deceptive sales pitches and promotions, and even disciplined employees for failing to do so:

a.      For example, according to FE-9, during every sales training s/he did at CenturyLink throughout out a 14-year career, the trainers would instruct representatives that they could quote a single price for internet service without disclosing underlying fees (such as the maintenance fee, internet recovery fee, and other charges) that might be included, so long as the customer did not ask. These instructions were given at monthly sales meetings and sales strategy courses by Company trainers and would have been approved by Olsen, FE- 9 said, because "everything" on training "had to go past her desk and be approved beforehand." According to FE-9, representatives were specifically told that if a customer "doesn't ask you don't have to tell them" that the single quoted price included other, optional products. FE-9 was even disciplined for not hitting quotas because s/he spent too much time, according to his superiors, telling customers what their actual charges would be.

b.      FE-5 likewise said that when s/he attended a training class, "the facilitators were straight up telling new hires just to tell people what the total price was and not what all the items were"—which FE-5 knew from her/his experience was in violation of both Company policy and federal regulations. Former Employee No. 11 ("FE-11"), who worked as a Retention Specialist from 2006 through 2016 in the Southeastern United States, similarly confirmed that this practice – quoting one price but not disclosing that individual services included in the package were optional – would be encouraged by his/her call center manager at monthly meetings. According to FE-11, "[t]hat is cramming; it's highly illegal, and we were instructed to do it."

**CenturyLink Secretly Transformed Its "Customer Service" Department Into A Sales and Revenue Retention Operation**

80.      CenturyLink's billing misconduct was also facilitated by CenturyLink's creation of a "customer service" department whose primary function was to sell services— not resolve complaints or provide customer service—as well as a complaint escalation department that was

designed to minimize any refunds the Company owed customers. The Securities Class Complaint details the following:

a.      During the Relevant Period, CenturyLink employed approximately 250 to 450 "retention specialists" who were tasked with preventing customers who would complain about their bills from terminating their contracts with CenturyLink. Former Employee No. 12 ("FE-12"), who worked  as a Retention Specialist  from December 2015 through December 2017 in the Southeastern United States, explained that retention specialists' compensation was tied to the number of accounts they could "save" – *i.e.*, prevent from disconnecting – and that retention specialists were instructed to "save by selling."  FE-12 said that retention specialists would get a bonus if their retention rate was 85% or higher— meaning they were able to "save" 85% or more of all threatened disconnects.

b.      Even though retention specialists were responsible for addressing billing disputes and "saving" customer accounts, FE-12 said that retention specialists were limited in the amount of "credits," or refunds, they could offer customers to resolve billing disputes. Specifically, credits for more than $50 needed a supervisor's approval, and the Company's computer systems made it physically impossible to give back credits for more than three months' worth of charges. Along similar lines, FE-10 reported that retention specialists were limited to giving out credits of around $3.50 to $5 per customer. At the same time, FE-11 reported, retention specialists were also required to sell CenturyLink services, and had minimum sales quotas just like regular CenturyLink sales representatives.

c.      In addition to a team of "retention specialists," CenturyLink also created a National Order Help Desk, or NOHD, that handled customer "escalation" complaints – *i.e.*, complaints in which a customer demands to "speak to a supervisor" – to account for the overflow

of calls the Company received about improper bills and other complaints. FE-9, who worked at the NOHD from 2009 through 2015, explained that approximately 90% of the escalation calls s/he received were from customers complaining that they had fees and charges added onto their accounts without their knowledge. According to FE-9, if the customer was able to prove he or she had been misquoted, NOHD employees offered to honor the misquoted price for the current month and the next month—but would not honor the price for a longer period than that.

d.    But CenturyLink made it difficult for customers to receive any refund at all. According to Former Employee No. 13 ("FE-13"), who worked as a NOHD Consultant from 2010 until 2014 in the Western United States, CenturyLink made it nearly impossible for customers to successfully challenge the wrongful charges they incurred. FE-13 explained that it was the Company's policy that customers had the responsibility to confirm the accuracy of their bill, and if they did not verify the information provided during their price quote, that was their problem. FE-13 explained that, because recordings of sales calls were only kept for about a month, it was virtually impossible for a customer to challenge a misquoted price or fraudulent bill. This is because under most promotions, the first month would be free, and customers would only receive their first "real" bill after that. According to FE-13, time was the biggest ally to the Company when it came to customer disputes. The Company put the burden on customers to prove the Company was wrong, but also implemented a policy of deleting the call recordings—the evidence that could show the customer had been misquoted—at around the same time the customer would learn he or she had been misled.

**CenturyLink's Enforcement of Unobtainable Sales Quotas Led to Illegal Cramming**

81.    The combination of quotas set without regard to sales representatives' ability to meet them and the severity with they were enforced led to the expected result—customer service

and sales representatives turned to deceptive sales practices.  The Securities Class Complaint details the following:

      a.      According to FE-11, cramming was "happening all the time, all day, every day," and that representatives who engaged in these practices included high sales performers who the Company named as "Circle of Excellence" honorees. Similarly, FE- 13 said that, while s/he worked in complaint escalations, s/he received calls from customers complaining that their bills charged different rates than they were quoted – and from customers who had been wrongfully charged early termination fees – every single day. FE-13 said that s/he also received calls from customers who said that phone lines appeared on their bills that they had not requested once or twice per week. According to FE-13, there was a lot of cramming and unethical behavior, that cramming was widespread throughout the Company, and that it was encouraged by the Company's aggressive enforcement of sales quotas.

      b.      FE-7, who served as a Customer Care & Sales Supervisor, explained that there were "many, many instances of people doing things that we knew were unethical," including cramming. FE-7 explained that one frequently "slammed" service was the Company's @Ease computer protection package, which, at one point, cost $5 per month for a two-month promotional period, and would then increase to $10 per month after the promotional period ended. According to FE-7, sales representatives would add @Ease service to customers' accounts without explaining that the promotional rate would expire or that they were adding the service at all, as sales of these products enabled representatives to meet their corrective action limit quota. As FE-7 explained, adding @Ease "counted as a sale and would make sure you weren't going to lose your job for missing your numbers." FE-4 similarly confirmed that adding CenturyLink's @Ease service to a customer's bill was a common, daily occurrence. Although CenturyLink did not explicitly instruct

employees to add @Ease without the customer's knowledge, the culture at the Company encouraged this conduct. FE-4 said that CenturyLink wanted employees to sell, and there were never any negative repercussions for adding services like @Ease to customer accounts.

c.      Former CenturyLink employees explained that the same "cramming" practices used in residential sales were also employed when selling to small-medium business customers. Former Employee No. 14 ("FE-14"), who began as a sales representative on the residential side in March 2014 but was then promoted to the small business and enterprise units before leaving the Company in October 2017, explained that sales representatives who "crammed" customers were the best performers, and thus were promoted to the business side. After being promoted, FE-14 explained, those same individuals would continue the same practices that led to their promotion in the first place.

d.      FE-14 described a typical tactic: a representative selling CenturyLink's small business services would tell a customer the options, provide a quote, and tell the customer to call back when the customer was ready to complete the order. However, the sales agent would then secretly place the order at that time and label the sale a "self-install." A "self-install" was selected to ensure that a technician would not arrive at the customer's business and alert the customer to the fact that service (from CenturyLink's standpoint) had, in fact, been ordered. FE-14 repeatedly received phone calls from customers looking to complete an order and would pull their information up on the Company's computer system and see that the order had in fact been placed during the original phone call. FE-14 reported instances of orders already having been placed, and was told management would investigate the problem, but did not see any evidence that anyone was ever disciplined for this practice.

82.    The financial impact of these cramming practices was highly material. The Securities Class Complaint details thousands of consumer complaints that reveal CenturyLink customers—including elderly consumers living on fixed incomes—were routinely overbilled hundreds of dollars each, and that the Company institutionalized a policy of refusing to honor confirmed, quoted prices. For example:

- L.F. switched to CenturyLink to save money, but her/his first bill was more than double the price CenturyLink had quoted. L.F. contacted CenturyLink and was told that s/he would receive credits for the overcharge, but the next month's bill was even higher. L.F. called CenturyLink in November 2013 requesting to disconnect his/her service, but continued to receive bills despite calling the company a second time in November, three times in January 2014, and two more times in February 2014. CenturyLink refused to cancel L.F.'s bill of $412.31 for services that L.F. sought to disconnect months before.

- J.F., a retired engineer, was offered internet service for a base rate of $19.99 per month, but received a bill for $367.33, including internet service for a base rate of $71. CenturyLink told J.F. that the Company had "verified" the $19.99 offer but would not honor the promised rate.

- S.H., a 70-year-old former director of a non-profit organization, purchased a CenturyLink package that the Company said would cost approximately $54 per month. S.H. was charged $103.87 and after calling CenturyLink, was promised that the bill would be fixed—but the Company charged $76.46 and $77.96 the following two months.

- When S.J. signed up for CenturyLink's internet service in October 2016, she was told by a CenturyLink representative that she could cancel without paying an early termination fee. A few months later, when S.J. tried to cancel, she was told that she would have to pay a $200 fee.  The company refused to honor its promise to cancel her service for no charge and instead offered to reduce the $200 cancellation fee to $146.20.

- K.T., a 76-year-old retiree, was promised a rate of $62.14 and $40.91 for the first and second months and then $85.92 per month for the rest of the year—but he was actually charged $172.24 the first month, or more than $100 above the promised price. CenturyLink then falsely promised to fix his bill.

- M.H., who is 81 years old and lives on a budget, agreed to keep her service after CenturyLink promised her the same rate for another year—but CenturyLink increased her bill and then charged her a series of changing

rates. CenturyLink then refused to give her the rate she was promised, claiming that there were no promotion that could give her the promised price, and then threatened to charge her a $200 cancellation penalty if she terminated her service—even though the CenturyLink agent she spoke to confirmed that the Company had lied to her.

83.    The above examples illustrate the financial impact of CenturyLink's cramming practices, which was so sizeable that it could not have escaped the attention of the Company's executives, including Defendants Storey, Ewing, Cole, Puckett, Douglas, Bailey, Post, and Patel.

**CenturyLink Documented Instances of Cramming**

84.    In all events, CenturyLink's senior management, including Defendants Storey, Ewing, Cole, Puckett, Douglas, Bailey, Post, and Patel were directly informed of the Company's cramming practices, and the rampant billing misconduct that was at the core of the consumer and small business sales strategy.   The Securities Class Complaint details the following:

a.    The Company's improper sales practices were documented and monitored through the Company's "quality assurance" program, and reported to managers through a "coaching" process that focused on ensuring sales and rarely led to discipline for billing misconduct. For example, NOHD employees were instructed to record and "coach" sales representatives about mishandled calls and, in doing so, routinely documented instances of cramming and other improper sales practices in the Company's computer systems, and communicated the violations to the representatives' supervisors. FE-9 explained that NOHD representatives were to investigate the reasons behind a customer's complaint and document them in a report in the Company's Order Quality Management, or OQM, system. According to FE-9, NOHD representatives would document cramming incidents in the OQM, which included various "codes" for violations of Company policy. These codes were listed in a drop-down menu and included, for example, misquoting a price, making improper or inaccurate notes in a customer's call history, or placing an "unauthorized service on account" – the Company's code for

"cramming." FE-10 said that, at one point, s/he was filling out a form for reports addressing unauthorized charges at least once a day and, at minimum, at least once or twice per week. As both FE-9 and FE-10 reported, OQM reports were automatically sent to the sales representative's supervisor, who was then responsible for "coaching" the representative and addressing the violation.

    b.  But because supervisors' compensation depended on meeting quotas, the corrective "coaching" or discipline rarely occurred. According to FE-9, although sales representatives were ostensibly supposed to have a quality rating of over 93% (meaning they could not have more than 7 OQM findings for every 100 calls), FE-9 knew of representatives who were reported for cramming every day who were never reprimanded. As FE-9 explained, "How many times do I have to ding this person? How do you keep them and not fire them? It was because just their immediate supervisor was reviewing them. The supervisor would discuss the OQMs with them and could [fire] them or discipline them.  But if I'm a supervisor why would I do that if they're selling all that stuff?"

    c.  FE-7 similarly reported that, despite extensive documented instances of cramming, responsible employees were rarely disciplined. FE-7 explained that when investigating complaints of cramming, s/he would pull the recording (if one existed) of the phone call, allow the representative to listen to it and allow the representative to explain the other side of the story, and then formulate a recommendation for FE-7's supervisor, the Call Center Director, who would then discuss the issue with Human Resources. FE-7 stated that there were a lot of sales representatives who were repeat offenders and had multiple documented incidents of unethical sales conduct but were not disciplined. FE-7 recalled one sales representative who had 13 documented cases of unethical sales behavior that were logged in the Company's coaching database but was never

disciplined. FE-7 said that, because s/he had access to the Company's coaching database, s/he could see complaints s/he had made about certain sales representatives did not result in any corrective action. When s/he failed to see any corrective action measures taken, FE-7 would call the Company's integrity or "tips" line, which would assign a confirmation number to the complaint that could be used to check on any follow-up investigation. In numerous cases, FE-7 would report instances of cramming, and go back and check the status of the complaints s/he reported. None of those complaints were ever updated to reflect they had been addressed.

        d.     The sales practices used at the Company's call centers were also documented and reviewed by a separate Quality Assurance department. As explained by Former Employee No. 16 ("FE-16"), who worked as CenturyLink's Manager of Customer Experience from April 2011 to July 2015, the Company's Quality Assurance team would review four calls made by each sales representative every month, score those calls, and provide feedback in reports in a system called Q-FINITY. The calls would be scored by a team of approximately 88 workers (66 contracted by an overseas outside vendor and 22 located in the U.S.) on about 26 or 27 different metrics or questions, such as whether the representative reviewed what the customer currently had in service, offered the customer other products, and quoted the correct rates and internet speed. Once a call was reviewed and scored, the representative's supervisor would be notified by email, and could then pull up the report on the Q-FINITY system. Any team leader, director or vice president also had access to the QA call scores, and every month FE-16's team would compile a report that was sent to team leaders, directors, VPs, and regional VPs analyzing trends and other metrics from the scoring data.

        e.     Two circumstances prevented this QA review from providing an effective check on inappropriate sales behavior. First, according to FE-16, the review and enforcement of

the QA findings was the responsibility of call center supervisors who were not incentivized to discipline employees. As FE-16 explained, although the QA results were at one time factored into compensation for call center managers and supervisors, the QA metric was removed from monthly bonus compensation in 2014 for all call center director-level employees and below—a decision that was implemented by Olsen and approved by Senior Vice President Consumer Sales & Care, Kathy Victory. As a result, according to FE-16, "supervisors were 100% not incentivized for QA."

f.       Second, the QA department was effectively eliminated in February 2015 for cost reasons, and the responsibility for QA was given to call center supervisors. FE-16 had "grave concerns" over the elimination of the QA department, which s/he expressed to Olsen and Victory, given "how valuable our practice was in calling out inappropriate behaviors and changing behaviors at the call centers." FE-16 explained that moving the QA process in-house and having supervisors review calls was not effective because poor reviews made the supervisors look bad. As a result, after the QA department was eliminated, "supervisors were not conducting reviews at all" and "were just checking the boxes they needed to."

g.       Despite the fact that CenturyLink employees who routinely witnessed cramming and other deceptive sales practices reported that this misconduct was rarely punished, the conduct was so widespread that – even though "rarely" addressed – the Company's human resources department still disciplined employees for cramming on a routine basis. FE-17, who was Director of Human Resources for consumer and small business sales from April 2011 until December 2016 and oversaw over 8,000 employees, said her/his team received complaints from call center sales employees about the unreasonableness of sales goals and would get exit survey data from employees who left the Company who said they were not being paid enough to be put under the kind of pressure they were subjected to. FE-17 said that CenturyLink employees were

frequently terminated for cramming accounts, and those employees would tell Company investigators that they crammed customer accounts because they were under pressure to make sales and felt they had to do so or would risk losing their jobs. FE-17 said the cramming issues were documented in exit interviews, and that these facts were shared with call center directors, as well as FE-17's supervisor, Vice President of Human Resources Kathy Flynn. Former Employee No. 20 ("FE-20"), who worked as an HR Business Partner from 1995 through April 2015, similarly confirmed that cramming and unethical sales behavior was always an issue at CenturyLink, employee turnover was horrible, and the major reason people would leave was due to the fact that sales goals were impossible to meet—a concern that was expressed to CenturyLink's HR department during exit interviews and other separation processes.

h.      The complaints concerning customer cramming and other deceptive sales practices were also regularly reported to CenturyLink's senior management, including Defendants Storey, Ewing, Cole, Puckett, Douglas, Bailey, Post, and Patel in monthly reports generated by the Company's Executive & Regulatory Services division. Former Employee No. 18 ("FE-18") worked as one of three managers of that division from 2009 through March 2014 and was responsible for handling complaints from the FCC, state attorneys general and the Better Business Bureau, as well as "executive complaints," or formal written complaints to Defendant Post and other "C-level" executives. FE-18 dealt with hundreds of complaints per month, and the majority of those were customers who said they had been defrauded through cramming or otherwise improperly billed. Of the cramming complaints FE-18's team reviewed, about half were substantiated and "did, in fact, happen like the customer said it did." FE-18 explained that top performing sales employees and Circle of Excellence honorees were frequently identified as repeat offenders – i.e., were identified in customer complaints for cramming – and that FE-18 and other

managers in her/his division repeatedly told Victory that this was the case. Former Employee No. 19 ("FE-19"), who worked as a Manager of Executive Complaints from 2009 through June 2013, similarly reported that top sales performers were often the worst offenders regarding cramming, a fact that FE-19 team looked into and confirmed multiple times.

    i.    FE-18's team emailed monthly reports to CenturyLink's senior leadership – including Defendant Post, Defendant Puckett, Victory and Olsen – reporting on the number, types and categories of complaints from the FCC, state agencies, the BBB and direct customer escalations. According to FE-18, the majority of the complaints were billing related, and the reports specifically identified "slamming/cramming" as a complaint category. As FE-18 explained, the data on these complaints were discussed with CenturyLink senior management, including Victory, on conference calls focused on operations reviews. FE-16, who was involved in this monthly reporting, confirmed that billing complaints were always one of the key things the reports would analyze. According to FE-16, the "complaint that always stood out was misrepresenting prices. We always had those issues."

    j.    FE-19 likewise confirmed that Defendant Post, Defendant Puckett, and Victory were sent and reviewed monthly reports concerning the cramming complaints that CenturyLink received, and those reports included specific category of complaints for cramming— a "very common and widespread" issue cited by customers. According to FE- 19, after reviewing the reports, Defendant Post, Defendant Puckett and Victory would often complain to FE-19 that the number of complaints was inaccurate and too high. As FE-19 explained, the numbers reported to senior management were accurate – and FE-19 would confirm the accuracy of the reports and the team's process to Defendant Post, Defendant Puckett and Victory, who never provided any justification for believing the numbers were wrong. According to FE-19, this was because

Defendant Post and Defendant Puckett knew the numbers were accurate and only claimed they were not "so they didn't have to deal with it."

       k.      FE-19's team was responsible for investigating customer complaints submitted by regulatory bodies like state Attorneys General, public utility commissions, and the FCC, and would review an average of 4,000 complaints per month, half of which were related to billing issues and cramming, as well as customer escalation complaints about cramming addressed to Defendant Puckett and Defendant Post. Defendant Post would often ask FE-19's team to look into complaints addressed to him, resolve them, and report back. When FE-19 would report back to Defendant Post about the resolution, he would often complain about it—typically, according to FE-19, Defendant Post would say that FE-19's team had given the customer too much compensation.

       l.      FE-19 explained that, despite the substantial number of complaints and evidence of cramming – which was clearly occurring in every state in which CenturyLink did business – CenturyLink's senior leadership refused to meaningfully address the problem. FE-19 said that FE-19's team would provide recommendations about what could be done to reduce cramming to Defendant Post, Defendant Puckett and Victory, but they never acted on those recommendations.

       m.      According to FE-19, this was because Defendant Post, Defendant Puckett and other senior executives were not willing to lose revenues in order to reduce the number of complaints. To illustrate, FE-19 described CenturyLink's response to at least four state Attorney General civil investigative demands issued between 2009 and 2013 in which 600 out of 700 consumer complaints (or 83%) were substantiated by FE-19's team. Despite repeated civil investigative demands, CenturyLink refused to change its practices. According to FE-19,

CenturyLink senior leadership simply did not take the Attorney General investigations seriously—indeed, FE-19 reported that senior management would rather "just pay the fines" than "kowtow" to state Attorneys General.

**CenturyLink's Senior Management Recognized the Unsustainability of the Company's Illegal Scheme**

85.     By the beginning of the Relevant Period, the Company's improper sales practices became a central focus of the CenturyLink's senior management, including Defendants Ewing, Post, Cole, Puckett, and Bailey. The Securities Class Complaint details the following:

a.     In April 2014, FE-5 alerted both her/his manager, Northwest Region Vice President Brian Stading, and Defendant Bailey of the cramming issues s/he encountered. Specifically, on or around April 23-27, 2014 at the Company's "Circle of Excellence" event at the Breakers Hotel in Palm Beach, Florida, Stading introduced FE-5 to Defendant Bailey specifically so that FE-5 could address the constant and rampant cramming and misquoting problems s/he encountered to CenturyLink's most senior-level managers. In that discussion, FE-5 explained the complaints and issues with cramming s/he was experiencing. In response, Defendant Bailey acknowledged these cramming issues were occurring, and told Stading and FE-5 that "We've got to do something about our call centers."

b.     After this discussion, Defendant Post sent out a corporate-wide email saying that the Company was creating a new position for Defendant Bailey on business ethics and how the Company deals with customers.  After receiving the email announcing the new position, FE-5 sent Defendant Bailey an email reminding him of their conversation at the Breakers and asked to be a part of the team that was going to be fixing the call center issues.

c.     At around the same time, CenturyLink's senior management began to develop a new behavioral coaching model for its sales employees—another action that was

prompted by the complaints the Company's cramming and deceptive practices had generated. In 2014, FE-17's team developed a new way to measure employee performance. Instead of judging employees on numerous metrics, which FE-17 said were impossible to meet, FE-17's team developed a new "behavioral coaching" model which judged employees on three overall criteria: how many customers did the employee help, did the employee resolve all issues the customer presented, and did they provide good customer service. Flynn was convinced to adopt this change, and supervisors were trained to provide behavioral coaching (rather than focusing on metrics) using this criteria. According to FE-17, when this new system was rolled out, it was initially well received. Defendant Post recognized Flynn for her work on the project, and employees provided positive feedback, boosting morale. According to FE-17, the number of complaints from customers declined significantly, as did terminations for unethical behavior.

d.      However, after only a few months, CenturyLink's sales numbers took a downturn. According to FE-17, after the decline in sales, the Company's senior management reverted back to the old metrics system almost immediately because CenturyLink senior management could not tolerate any drop in sales.

e.      Numerous other former employees confirmed the change in the disciplinary model, and the impact on sales.   For example, FE-20 confirmed that the switch to behavioral coaching model was done, in part, as an attempt to lower the number of cramming incidents. FE-20 described how employees who were determined, through an HR investigation, to have committed unethical sales behavior would say that it was something they felt they had to do in order to keep their jobs—and the effort to reduce this pressure motivated the switch to behavioral coaching. According to FE-20, "Recruiting couldn't even keep the turnover. We were having so

much discipline and so many investigations, and we were hearing in the exit interviews that it was because of the sales quotas," so CenturyLink had to stop enforcing them so strictly.

       f.     Similarly, FE-1 recalled a change in corrective action policy around 2014 whereby sales representatives received behavioral coaching while supervisors were to be held accountable for sales numbers. According to FE-1, after this change was adopted, sales fell off "very quickly," and thereafter the Company went back to the old model of enforcing quotas at the sales representative level. Similarly, FE-8 recalled a change to a behavioral coaching model in 2014-2015 which was less focused on a metrics-heavy scorecard. Like FE-17, FE-8 said that while the change was initially well received, it immediately led to a significant drop in sales. As FE-8 reported, "I remember results dropping drastically when people were no longer being managed to a number."

      86.     Rather than reveal the truth about the Company's practices, CenturyLink concocted a false narrative to explain revenue declines. For example, in announcing CenturyLink's 2014 fourth quarter results on February 11, 2015, Defendant Post blamed the "weaker" revenues on a recent reorganizational alignment and warned that this realignment could "result in some additional negative impact on our sales momentum in the first half of 2015"—an explanation that provided cover for the sales dip associated with the Company's relaxing of the strict quota-enforcement system, and the time needed to ramp sales back up again after the behavioral coaching model was aborted. When the Company's first quarter results and CenturyLink's consumer segment missed revenue estimates, Defendants again blamed the sales alignment, and again, analysts credited Defendants' explanations. For example, UBS noted that consumer segment revenues were approximately $8 million below estimates while Oppenheimer—which also

expected better results—noted "[w]eakish [f]undamentals" in the consumer segment. No analyst suspected that these results were driven by CenturyLink's attempt to remedy cramming.

87.     Just a month later, on June 2, 2015, and just three months after the Company announced that Defendant Puckett had been promoted to the head of global sales, CenturyLink announced that Defendant Puckett was leaving the Company. No explanation was given for her departure. A press release announcing the move quoted Puckett as saying that she was "looking forward to spending more time with my family and considering other leadership opportunities that allow me to continue to have a significant impact."

88.     Shortly thereafter, CenturyLink's return to the metrics-based system and strict enforcement of sales quotas began to take hold. For example, during the Company's third quarter 2015 earnings call on November 4, 2015, Defendant Post highlighted a "solid quarter" in the consumer segment, with revenues growing $18 million year-over-year. Defendant Post did not disclose the true driver of this sales growth—*i.e.*, the Company's undisclosed cramming practices—but rather credited CenturyLink's strategy of "attracting more high-value customers" and pursuing "higher value bundled sales and select pricing increases."

89.     By year-end, the return of the Company's prior sales practices had taken effect, and the Company was able to again report favorable results to Wall Street. For example, in announcing year-end results on February 10, 2016, Defendant Post attributed the reported rebound in revenues to the "aggressive corrective action" the Company had taken, as well as the realignment of the sales force and new leadership appointments (*e.g.*, Douglas's replacement of Puckett). For his part, Defendant Ewing told investors that "churn reduction" as well as a concerted effort to "keep the customers we have and try to make some of the price declines and credits that we've been issuing smaller" led to the improved results.

**The SEC Questions CenturyLink About Its Consumer Segment Disclosures and the Company's Compliance With Item 303 of Regulation S-K**

90.     At the same time CenturyLink publicly attributed its rejuvenated revenue growth to a shift in strategy, the Company was instructed by the SEC to disclose any known trends that impacted its consumer segment results.

91.     Specifically, in correspondence from the SEC's Division of Corporation Finance on August 11, 2015 to Defendant Cole, the SEC requested that CenturyLink provide more information concerning the revenue composition of the Company's consumer segment, as well as the Company's "marketing and sales efforts" of its "strategic" services. In doing so, the SEC specifically cited the Company's need to comply with Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350, which requires disclosure of, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

92.     Under Item 303, CenturyLink was required to disclose the fact that the Company's illegal and deceptive sales practices were a material driver of the Company's reported revenue in the consumer and small business segments—and that the Company's efforts to alter those practices, and reduce cramming, had resulted in a decline in revenue. CenturyLink's senior management were aware of and/or specifically approved significant changes to the Company's sales employee discipline and compensation scheme in order to address these practices. The Company further recognized that, when these changes were made, they immediately and materially impacted revenues. Moreover, that revenue decline was so significant that CenturyLink reverted back to its prior method of disciplining sales employees almost immediately.

93.     On September 8, 2015, the SEC again questioned CenturyLink about the Company's disclosures concerning the operating performance of its consumer segment, stating

that additional information about the operating margins of strategic and legacy services was necessary and "material for a complete investor understanding."

94.     In a September 22, 2015 response letter to the SEC from Defendant Cole, which copied CenturyLink's Audit Committee Chair W. Bruce Hanks, CenturyLink misleadingly claimed that "price compression and customer disconnects caused by competition" were the primary drivers of performance. In other words, despite the clear requirements of Item 303 and Defendants' knowledge that changes in the Company's sales practices had dramatically impacted consumer revenues – and despite being directly questioned about it by the SEC – CenturyLink continued to conceal the material impact its sales practices was having on the Company's financial performance.

**A CenturyLink Director Who Accused Defendant Post of Conduct that Raised "Serious Governance, Transparency and Honesty Issues" Was Forced Off The Board**

95.     Shortly after CenturyLink responded to several questions from the SEC about its consumer segment disclosures, one of the Company's longtime directors accused CenturyLink and Defendant Post of conduct that raised "serious governance, transparency and honesty issues," and warned the Company that a press release it had prepared was "incomplete and inaccurate" and "deliberately misleading in a material way."

96.     Specifically, beginning in November 2015, Defendant Post and other senior members of the Company's Board began to orchestrate the removal of former director Joseph Zimmel, who had served on the Board since 2003 and was then one of four members of the Company's Audit Committee. As a member of the Audit Committee, Zimmel would have been aware of and reviewed the Company's responses to the SEC about the lack of disclosure surrounding the Company's consumer segment.

97.    As revealed in email correspondence that Zimmel forced CenturyLink to publicly file with the SEC, Zimmel was presented with an ultimatum by the Board's chair in December 2015 after several directors "decided [Zimmel] had to go." Zimmel said his forced resignation was improperly orchestrated without input from the rest of the Board, and was contrary to their wishes. As Zimmel put it, except for the "Monroe or Monroe related directors," all disinterested Board members said that removing Zimmel from the Board "was wrong, that it was not good for the company, that I added a lot of value, that I was an important and needed voice on the board."

98.    Notably, the facts and circumstances surrounding Zimmel's ouster would not have become public if Zimmel had not forced the Company's hand by specifically stating in an email to Defendant Post, Board Chairman Bill Owens, CenturyLink General Counsel Stacey Goff and CenturyLink's outside counsel that "[a]nything short of disclosing the full and accurate account of events would be misleading in a material way." At Zimmel's suggestion, CenturyLink publicly filed the emails he exchanged with them in a Form 8-K on January 25, 2016.

99.    As reflected in that correspondence, CenturyLink's senior leadership went to significant lengths to conceal the true facts concerning Zimmel's ouster. As Zimmel told Defendant Post and Goff in those emails, the original draft press release CenturyLink prepared announcing Zimmel's departure was "incomplete and inaccurate" and "deliberately misleading in a material way." As Zimmel explained, the conduct of the Company's senior leadership "raised serious governance, transparency and honesty issues" and only further corroborates Defendants' proclivity to mislead.

**The Arizona Attorney General Investigates and Accuses CenturyLink of Fraudulent and Deceptive Conduct**

100.    After CenturyLink returned to its prior sales model, billing complaints again began piling up—leading consumers to lodge complaints with their state attorneys general. Those state

attorneys general soon began to investigate the reasons behind the escalating complaints against the Company.

101.    On or about March 2016, the Arizona Attorney General launched such an investigation. This investigation found that CenturyLink had engaged in numerous deceptive practices in the sale and marketing of internet and telephone services that violated the Arizona Consumer Fraud Act and, specifically, that CenturyLink had:

- Failed to adequately disclose material qualifying conditions that applied to promotional rates, such as the requirement that consumers enter into a term commitment or that they authorize CenturyLink to automatically withdraw monthly payments from their financial accounts;

- Failed to adequately disclose the advertised promotion rate would end before the consumers' term commitments expire, thus requiring consumers to continue purchasing services at a non-promotional rate for the remainder of the term;

- Failed to disclose that if consumers cancel their contract before their term commitment expires, they will be charged an early termination fee;

- Failed to disclose that a consumer will be required to purchase or lease a modem-router for high speed internet service;

- Failed to disclose that a consumer would be charged an installation fee for certain services;

- Billed consumers at rates higher than those it represented during sales calls with consumers;

- Billed consumers an early termination fee when the consumer cancelled his or service upon discovering that CenturyLink was charging the consumer higher rates than those it represented during the sales call;

- Billed consumers for periods of service before such services were connected, for services that were never connected, and for products that were never received, without subsequently giving those consumers a credit for such charges;

- Billed consumers for services and products that the consumer never requested without subsequently giving those consumers a credit for such charges;

- Failed to process consumers' service cancellation requests in a timely manner and billing them for the period of time such service remained connected following the consumers' requested cancellation date, without providing a subsequent credit for such period of time; and

- Charged consumers full price for leased modems that consumers returned to CenturyLink within the required time frame and, in many cases, subsequently referring the consumers' accounts to collection when the consumers refused to pay for returned modems.

102.    In the face of the Attorney General's findings, CenturyLink quietly agreed to a settlement in which it promised to take a number of measures intended to prevent consumers from being misled and improperly charged. Specifically, on April 6, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General in which the Company (falsely) denied any wrongdoing, and where it "expressly denie[d]" each and every one of the Arizona Attorney General's allegations. Indeed, in the Assurance of Discontinuance, CenturyLink claimed that all terms, materially qualifying conditions, termination fees, availability of high speed internet speeds, modem/router purchase requirements and installation fees were "fully disclosed."

103.    Despite the seriousness of the Arizona Attorney General's allegations, CenturyLink resolved the inquiry with the small payment of $150,000 to cover the Attorney General's fees and costs. CenturyLink alleged that it settled the case solely as a "means of efficiently closing the Attorney General's investigation into this matter" and that the settlement did not represent "any admission of guilt, wrongdoing, violation or sanction." Rather, CenturyLink broadly denied "any violation of state, federal, or local law," that "any actions, inactions or practices of CenturyLink were a consumer fraud or otherwise legally improper," or that "any Arizona Consumers who are residential customers of CenturyLink suffered or incurred any damage or loss for which the law provides recourse."

104.    Nevertheless, as part of the Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, managerial [and] supervisory employees," CenturyLink also

agreed to comply with a number of prospective requirements intended to ensure compliance with the Arizona consumer protection laws, including:

- sending consumers a confirmation of the charges included in their bills within three days of a sale;

- conducting an investigation into any consumer complaints in which a customer alleges being charged for a product or service that was not requested, being charged at a price that was not accurately quoted, or being charged for a modem/router that the customer claimed to have properly and timely returned;

- agreeing that no customer bills would be sent to collections until an investigation was completed and the results were provided to the consumer; and

- confirming with the customer internet speeds before processing a customer's high speed internet order.

105.    To investors who were unfamiliar with CenturyLink's actual sales practices, the settlement did not appear to reflect any sanction whatsoever – as CenturyLink should have been following the steps required by the agreement in the first place. Indeed, CenturyLink led investors to believe that none of these requirements represented a change in CenturyLink's practices, and the Company "expressly denie[d] that its policies, practices or procedures that may be inconsistent with those set forth in this Assurance of Discontinuance fail to meet or violate any applicable standard."

106.    As a result of CenturyLink's denials, and the small $150,000 payment, the significance of the Arizona Attorney General's investigative findings was obscured from investors. Indeed, CenturyLink did not disclose the Arizona Attorney General's investigation or its settlement in any SEC filing or other public release, and the settlement was not identified or cited by any other public news or other source until months later.

**Despite the Ongoing Illegal Scheme, CenturyLink Describes Its Sales and Marketing Practices as Honest and Legitimate**

107.    Just weeks later, the Company again reported favorable results in its consumer segment. Instead of disclosing the impact of its actual sales practices on revenues or addressing the Arizona Attorney General settlement, CenturyLink attributed its success to strategy "adjustments."

108.    Specifically, when reporting the Company's first quarter results on May 4, 2016, Defendant Douglas highlighted a change in emphasis to "bundled broadband services" that was purportedly enabling the Company to sign up customers who were "less precluded to churn" and were going to generate a "higher ARPU." Most significantly, Douglas clarified that any difference between CenturyLink's ARPU figures and those of the Company's competitors was the result of its competitors charging unwanted fees— something that Douglas falsely told investors CenturyLink did not do:

> So I would tell you that our ARPUs are consistent with what you'd see at an ARPU level in our competitors. And we see competition adding a lot of fees. And so, that's where there might be a little bit of a delta, but we're working through, and constantly monitoring what our competitors are doing in the marketplace, with regard to the average ARPUs in our business.

**The Illegal Scheme Continues While the Minnesota Attorney General Issues A Civil Investigative Demand and A Whistleblower Complaint is Filed**

109.    Just one week after Defendant Douglas assured investors of the Company's sales practices and ARPUs, on May 12, 2016, the Minnesota Attorney General's Office sent a civil investigative demand to CenturyLink following a growing wave of complaints from Minnesota consumers who had been victimized by the very same deceptive practices as millions of other customers across the country.

110.    Ultimately the Minnesota Attorney General disclosed that Defendants engaged in a series of obstructionist tactics to frustrate the investigation.

111.    As CenturyLink's senior management was attempting to keep the Minnesota Attorney General at bay, Defendants continued to receive repeated reports, both internally from employees and externally from customers and regulators, concerning the fraudulent practices carried out in the Company's call centers. One such employee, Heidi Heiser, who worked as customer service and sales agent in Arizona beginning in August 2015, brought those issues directly to the attention of Defendant Post.

112.    As she would later allege in a whistleblower lawsuit, Heiser witnessed CenturyLink customers being charged for services that they did not request and that CenturyLink's sales quota and disciplinary systems encouraged this conduct. As Heiser and numerous former employees confirm, this inevitably led to rampant cramming and charging of unauthorized services on customer accounts, which meaningfully contributed to the revenues that CenturyLink reported to investors. According to Heiser:

> CenturyLink management had not only created the workplace incentives, sales practices, and lack of oversight that encouraged the fraudulent assignment of unauthorized lines or services, and related charges, to customer accounts, but they were knowingly and intentionally ignoring the customer complaints about such practices and enforcing such policies that allowed CenturyLink to keep payments received on unauthorized charges and to encourage more such payments.

113.    At the same time Heiser became increasingly troubled by CenturyLink's fraudulent business practices – which she reported to her direct supervisor (Christine Wells) and as well as two other supervisor-managers (Denise Medina and Michael Del Campo) – a strikingly similar fraudulent scheme at U.S. banking giant Wells Fargo began to make headlines. Specifically, on September 8, 2016, regulators investigating Wells Fargo announced $185 million in fines for the undisclosed company practice of sales representatives adding accounts without customers' knowledge, triggering extensive media coverage and congressional investigations. According to

the CenturyLink whistleblower, there were "frightening parallels between the Wells Fargo Bank scandal and what she saw happening at CenturyLink."

114.    After none of her complaints led to any discipline or action by CenturyLink management, Heiser brought her concerns to the Company's CEO. Specifically, in an online Townhall meeting where Company employees had the opportunity to post questions to online message board for review by Defendant Post in October 2016, Heiser posted an online question asking the CEO "why customers were being given multiple accounts and being billed for things they did not ask for" – again alerting CenturyLink's senior-most management to the cramming practices they had monitored for years.

115.    Heiser's question was removed from the message board shortly after she posted it and just two days later, Heiser was alerted she had been suspended—and later terminated—as retaliation for blowing the whistle.

## DEFENDANTS' NUMEROUS FALSE AND MISLEADING STATEMENTS

116.    Defendants allowed the Company to make statements in the Company's SEC filings during the Relevant Period, on earnings calls, and during other public presentations. Specifically, Defendants caused the Company to make numerous materially false and misleading statements and omissions, including those regarding: (1) the nature of the Company's "customer first" business strategy and, particularly, CenturyLink's purported strategy of providing products and services according to customers' "needs" and its purported practice of "bundling" its products and services; (2) the reasons behind the Company's financial performance, including the basis of the revenues it reported from consumers and small business customers, the impact of the Company's "bundling" marketing strategy, and the quality and demand for the Company's services; (3) the reasons behind CenturyLink's fluctuating financial results, which had been secretly impacted by the Company's quickly-aborted effort to address its deceptive sales practices

cramming crisis; (4) CenturyLink's business conduct, particularly as it related to sales practices, business integrity, and ethical standards, as well as the Company's statements minimizing, and denying the Company's fraudulent billing practices in response to news reports that began to highlight them; and (5) CenturyLink's material omissions under Item 303.

117.    On March 1, 2013, Defendants caused the Company to file its Form 10-K annual report for fiscal year 2012 (the "2012 10-K") with the SEC.  In its 2012 10-K, CenturyLink stated that it "rel[ied] on [its] call center personnel to promote sales of services that meet the needs of our customers."  According to CenturyLink, its "approach" to its "residential customers emphasizes customer-oriented sales, marketing and service with a local presence."  CenturyLink stated that it "market[ed] [its] products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties."

118.    Regarding the Company's compliance with its written code of conduct, the 2012 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."

119.    The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Post and Ewing, certifying that the financial information contained therein was accurate and disclosed any material changes to the Company's internal

control over financial report.  The 2012 10-K was also signed by Defendants Cole, Boulet, Brown, Hanks, Perry, and Siegel.

120.    CenturyLink repeated these statements regarding its regulations and compliance in its annual reports filed on Form 10-K for fiscal year 2013 (the "2013 10-K"), filed on February 27, 2014.  The 2013 10-K was signed by Defendants Cole, Boulet, Brown, Hanks, Perry, and Siegel and contained SOX certifications by Defendants Post and Ewing.  The 2013 10-K detailed the Company's sales practices as follows:

### Products and Services

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video services and other ancillary services.

**We offer our customers the ability to bundle together several products and services.** For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. **We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.**

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. **We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.**

*** 

**Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.** We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

**Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through bundles of services and integrated service offerings.** Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

***

*Consumer*

**Strategic Services**

With respect to our strategic services, competition is based on price, bandwidth, quality and speed of service, promotions and bundled offerings. Wireless carriers' fourth generation, or 4G, services are allowing them to more directly compete with our strategic services. In providing broadband services, we compete primarily with cable companies, wireless providers and other broadband service providers. In reselling DIRECTV video services, we compete primarily with cable and other satellite companies as well as other sales agents and resellers. Our Prism$^{TM}$ residential video service faces substantial competition from a variety of competitors, including well-established cable companies, satellite companies and several national companies that deliver content over the Internet and on mobile devices at little or no cost to their customers. Many of our competitors for these strategic services are not subject to the same regulatory requirements as we are, and therefore are able to avoid significant regulatory costs and obligations.

**Our strategy for maintaining and increasing our base of broadband customers is based on pricing, packaging of services and features, quality of service and meeting customer care needs.** In order to remain competitive, we believe continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. While traditional ATM-based broadband services are declining, they have been more than offset by growth in fiber-based broadband services. We also continue to expand our product offerings including facilities-based video services and enhance our marketing efforts as we compete in a maturing market in which a significant portion of consumers already have broadband services.

**Legacy Services**

Although our status as an ILEC continues to provide us advantages in providing local services in our local service area, as noted above we increasingly face significant competition as an increasing number of consumers are willing to substitute cable, wireless and electronic communications for traditional voice

telecommunications services. This has led to an increase in the number and type of competitors within our industry, price compression and a decrease in our market share. As a result of this product substitution, we face greater competition in providing local and long distance services from wireless providers, resellers and sales agents (including ourselves), social media hosts and broadband service providers, including cable companies. We also continue to compete with traditional telecommunications providers, such as national carriers, smaller regional providers, CLECs and independent telephone companies.

**Our strategy to reduce access line loss is based primarily on our pricing, packaging of services and features, quality of service and meeting customer care needs. While bundle price discounts have resulted in lower average revenues for our individual services, we believe service bundles continue to positively impact our customer retention. In addition to our bundle discounts, we also offer limited time promotions on our broadband service for prospective customers who want our broadband service in their bundle, which further aids our ability to attract and retain customers and increase usage of our services.**

(emphasis added).

121.    Regarding the Company's compliance with its written code of conduct, the 2013 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."

122.    On May 7, 2014, Defendants caused the Company to issue a press release and file a Form 8-K with the SEC reporting its financial results from the quarter ended March 31, 2014 ("Q1 2014").  The press release stated as follows in relevant part:

"**CenturyLink generated strong first quarter financial and operating results, driven by continued business demand for high-bandwidth data services, consumer demand for high-speed Internet and Prism TV services, hosting revenue growth and a solid improvement in the rate of legacy revenue decline,**"

said Glen F. Post III, chief executive officer and president. "Total operating revenues of $4.54 billion for the quarter exceeded our revenue guidance and our first quarter 2013 total operating revenues of $4.51 billion, reflecting stronger than anticipated Data Integration revenues, while Core Revenues of $4.11 billion were near the top of our guidance. Cash flows for the quarter were also strong primarily due to our revenue outperformance and disciplined cost containment by our employees.

"We continue to see increasing demand from business customers for our reliable, secure solutions that meet their network and hosting needs. We are pleased with the early success of our Managed Office product suite launch, as well as the continued strength in multi-site MPLS[3] sales. Our integration of Tier 3 continues to progress well as we added our new cloud nodes in two CenturyLink data centers in the first quarter and remain on track to add these nodes in four additional CenturyLink data centers by year-end. We believe this advanced cloud infrastructure technology significantly strengthens our capabilities to meet the growing demand for highly automated cloud and managed services.

**"Overall, I'm very pleased with first quarter results and our continued progress toward revenue stability,"** Post concluded.

 (emphasis added).

123.    On August 6, 2014, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2014 ("Q2 2014").  The press release stated as follows in relevant part:

"CenturyLink second quarter results reflect strong demand for our high-bandwidth data services and cloud and hosting solutions, solid consumer demand for Prism TV service and our continued mitigation of legacy revenue declines," said Glen F. Post III, chief executive officer and president. "Total operating revenues increased slightly year-over-year and exceeded our revenue guidance for the quarter. **Cash flows for the quarter were also strong, primarily due to solid revenue performance and continued focus by our employees on containing costs.**

"Our reliable, secure solutions that meet both network and hosting needs remain a strong driver of increasing demand from business customers. We continue to experience success with our managed service solutions, as well as multi-site MPLS sales. Our development of advanced cloud infrastructure technology significantly strengthens our capabilities to meet the growing demand for highly automated cloud and managed services, and we have further expanded our hosting footprint with the opening of the new Minneapolis — St Paul data center. Additionally, the expansion of symmetrical 1 gigabit service to 16 cities, announced yesterday, will enhance our capability to provide higher broadband speeds and an enhanced service experience to both residential and business customers.

"**Overall, we are pleased with our second quarter results, which reflect our continued progress toward revenue stability. We had a strong funnel of sales opportunities entering the third quarter and we are looking forward to continuing to execute on our strategic priorities to create value for shareholders**," Post concluded.

(emphasis added).

124.     On November 5, 2014, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2014 ("Q3 2014").  The press release stated as follows in relevant part:

"CenturyLink's third quarter results reflect our continued success in meeting the demand from business customers for high bandwidth data services, colocation, managed hosting, cloud and IT services," said Glen F. Post III, chief executive officer and president. "In our Business segment, high-bandwidth data services revenue, including MPLS[3], Ethernet and Wavelength, grew nearly 12% year-over-year and we achieved year-over-year revenue growth in this segment for the fifth consecutive quarter.

"We expect the expansion of our symmetrical 1 gigabit service to 16 cities that we announced in August to create additional opportunities to drive strategic revenue growth from businesses and consumers in the months ahead. **Also, we have recently integrated and aligned our sales and service delivery models to improve the consistency and effectiveness of our go-to-market strategies as we remain focused on driving increased sales and operating efficiencies in our business**," Post concluded.

(emphasis added).

125.     On February 24, 2015, Defendants caused the Company to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 10-K").  Regarding the Company's sales practices, the 2014 10-K stated as follows:

***Products and Services***

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation,

Ethernet, network access, public access, wireless, video services and other ancillary services.

**We offer our customers the ability to bundle together several products and services.** For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. **We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.**

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. **We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.**

We conduct most of our operations under the brand name "CenturyLink." Our satellite television service is offered on a co-branded basis under the "DIRECTV" name. Our switched digital television service offering is branded under the name "Prism." The wireless service that we offer under our agency agreement with Verizon Wireless is marketed under the "Verizon Wireless" brand name.

**Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.** We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our approach to our business, wholesale and governmental customers includes a commitment to provide comprehensive communications solutions for small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties. We also market through indirect channels, including collaboration with existing clients and technology providers, telecommunications companies and system integrators.

***

### Consumer

**Strategic Services**

With respect to providing our strategic services to residential customers, competition is based on price, bandwidth, quality and speed of service, promotions and bundled offerings. Wireless carriers' fourth generation, or 4G, services are allowing them to more directly compete with our strategic services. In providing broadband services, we compete primarily with cable companies, wireless providers, technology companies and other broadband service providers. In reselling DIRECTV video services, we compete primarily with cable and other satellite companies as well as other sales agents and resellers. Our Prism residential video service faces substantial competition from a variety of competitors, including well-established cable companies, satellite companies and several national companies that deliver content over the Internet and on mobile devices at little or no cost to their customers. Many of our competitors for these strategic services are not subject to the same regulatory requirements as we are, and therefore are able to avoid significant regulatory costs and obligations.

**Our strategy for maintaining and increasing our base of broadband customers is based on pricing, packaging of services and features, quality of service and meeting customer care needs.** In order to remain competitive, we believe continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. While traditional ATM-based broadband services are declining, they have been more than offset by growth in fiber-based broadband services. We also continue to expand our marketing and product bundling efforts as we compete in a maturing market in which a significant portion of consumers already have broadband services.

### Legacy Services

Although our status as an ILEC continues to provide us advantages in providing local services in our local service area, as noted above, we increasingly face significant competition as an increasing number of consumers are willing to substitute cable, wireless and electronic communications for traditional voice telecommunications services. This has led to an increase in the number and type of competitors within our industry, price compression and a decrease in our market share. As a result of this product substitution, we face greater competition in providing local and long distance services from wireless providers, resellers and sales agents (including ourselves), social media hosts and broadband service providers, including cable companies. We also continue to compete with traditional telecommunications providers, such as national carriers, smaller regional providers, CLECs and independent telephone companies.

**Our strategy to manage access line loss is based primarily on our pricing, packaging of services and features, quality of service and meeting customer care needs.** While bundle price discounts have resulted in lower average revenues for our individual services, we believe service bundles continue to positively impact our customer retention.

(emphasis added).

126.    The 2014 10-K was signed by Defendants Cole, Post, Ewing, Boulet, Brown, Perry, and Siegel and contained SOX certifications by Defendants Post and Ewing.

127.    Regarding the Company's compliance with its written code of conduct, the 2014 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."

128.    On May 5, 2015, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2015 ("Q1 2015").  The press release stated as follows in relevant part:

> "During the first quarter, CenturyLink generated strong operating cash flow and free cash flow that exceeded our guidance, due primarily to lower than anticipated cash expenses," said Glen F. Post III, chief executive officer and president. "At the same time, total operating revenues came in near the lower end of our guidance for the quarter, reflecting lower than anticipated equipment sales that had minimal impact on our cash flows.
>
> **"We are beginning to see the benefits of the organizational realignment implemented in late 2014, and we are confident our new streamlined operating structure positions us to drive stronger sales results, strategic revenue growth and operating efficiency. We continue to see strong demand from business customers for high-bandwidth data services and our integrated network and IT managed services solutions**," Post concluded.

129.    On August 5, 2015, Defendants caused the Company to issue a press release and

file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended

June 30, 2015 ("Q2 2015").  The press release stated as follows in relevant part:

> "CenturyLink's results for the second quarter were below our forecast and Street consensus, primarily due to continued pressure on wholesale revenues and higher employee and benefit costs," said Glen F. Post III, chief executive officer and president.  **While we are disappointed with the financial results for this quarter, we are positioning CenturyLink to drive stronger sales, strategic revenue growth and improved operating cash flow in the months ahead.**

> "The sales force realignment that we completed earlier this year is gaining traction and beginning to positively impact our results. For example, the improvement in sales to business customers that began in March continued throughout the quarter, resulting in 15% sequential growth in Business sales compared to first quarter sales. In addition, we exited the second quarter with a strong funnel of sales opportunities, which has continued to grow.

> **"While our path to revenue and cash flow growth is taking longer than we initially anticipated, we remain confident that we have the right assets and strategies to drive long-term revenue growth**. We also have taken action to lower our planned capital investment and operating costs for the second half of 2015 to align with our current level of revenue generation," Post concluded.

(emphasis added).

130.    On November 4, 2015, Defendants caused the Company to issue a press release and

file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended

September 30, 2015 ("Q3 2015").  The press release stated as follows in relevant part:

> **"**CenturyLink achieved solid third quarter revenues from its Consumer and Business retail network customers, while Business wholesale and hosting revenues declined," said Glen F. Post III, chief executive officer and president. "Demand for high-bandwidth data services remained strong as our business network sales increased sequentially and year-over-year, primarily driven by enterprise and global customers.

> **"We exited the quarter with a very strong business sales funnel, including an increased number of large deal opportunities. This funnel has continued to strengthen during the fourth quarter and October sales results were the highest of the year.**

"We are also on track to achieve our targeted reduction of approximately $125 million in planned second half 2015 operating expenses, with the majority of the reduction expected to occur in the fourth quarter," Post concluded.

(emphasis added).

131.    On February 25, 2016, Defendants caused the Company to file a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Cole, Post, Ewing, Bejar, Boulet, Brown, Hanks, Landrieu, Perry, and Siegel. It also contained SOX certifications by Defendants Post and Ewing certifying the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2015 10-K reported revenues of $17.9 billion, compared to operating revenues of $18 billion in the previous year, and adjusted net income of $1.5 billion, compared to adjusted net income of $1.49 billion in the previous year. Furthermore, the 2015 Form 10-K stated the following in relevant part regarding the Company's sales practices:

### Products and Services

Our products and services include local and long-distance voice, high-speed Internet, MPLS, private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.

**We offer our customers the ability to bundle together several products and services.** For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as high-speed Internet, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. **We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.**

\*\*\*

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the

community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

We conduct most of our operations under the brand name "CenturyLink." Our satellite television service is offered on a co-branded basis under the "DIRECTV" name. Our switched digital television service offering is branded under the name "Prism TV." The wireless service that we offer under our agency agreement with Verizon Wireless is marketed under the "Verizon Wireless" brand name.

**Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.** Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

***

*Consumer Segment*

**Strategic Services**

With respect to providing our strategic services to residential customers, competition is based on price, bandwidth, quality and speed of service, promotions and bundled offerings. Wireless carriers' fourth generation, or 4G, services are allowing them to more directly compete with our strategic services. The manner in which we compete for high-speed Internet customers in this segment is substantially similar to the manner in which we compete for business customers, as described in the above section. In reselling DIRECTV video services, we compete primarily with cable and other satellite companies as well as other sales agents and resellers. Our Prism TV residential video service faces substantial competition from a variety of competitors, including well-established cable companies, satellite companies and several national companies that deliver content over the Internet and on mobile devices. Many of our competitors for these strategic services are not subject to the same regulatory requirements as we are, and therefore are able to avoid significant regulatory costs and obligations.

**Our strategy for maintaining and increasing our base of broadband customers is based on pricing, packaging of services and features, quality of service and meeting customer care needs.** In order to remain competitive, we believe

continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. We also continue to expand our marketing and product bundling efforts by offering a variety of bundled products and services with various pricing discounts, as we compete in a maturing market in which a significant portion of consumers already have broadband services. We offer these bundled products and services through various sales and marketing opportunities as further described above under the heading "Sales and Marketing."

(emphasis added).

132.    Regarding the Company's compliance with its written code of conduct, the 2015 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."  Based on these statements, the Company assured investors that they could take comfort in the Company's sales practices and the accuracy of its public disclosures.

133.    On May 4, 2016, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2016 ("Q1 2016").  The press release stated as follows in relevant part:

> **"CenturyLink achieved another solid quarter, with core revenues, operating cash flow and adjusted diluted earnings per share in-line with our previous guidance,"** said Glen F. Post III, chief executive officer and president. "Additionally, since the first of the year, we have completed two debt issuances totaling more than $1.2 billion, which strengthens our ability to invest in our business while returning cash to shareholders.
>
> **"We remain on track with our data centers and colocation business strategic alternatives process and are pleased with the level of interest and progress to date. We continue to focus on leveraging our strategic asset portfolio and financial strength to execute on our operational initiatives and better serve our customers,"** Post concluded.

(emphasis added).

134.    On August 3, 2016, Defendants caused the Company to issue a press release and

file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended

June 30, 2016 ("Q2 2016").  The press release stated as follows in relevant part:

> "CenturyLink delivered solid second quarter financial results with total operating
> revenues and core revenues in line with our guidance, and operating cash flow
> and adjusted diluted earnings per share that exceeded our previous guidance," said Glen
> F. Post III, chief executive officer and president. "**Our new sales and marketing
> leadership team continues to refine our sales channels and associated go-to-
> market strategies for the Business market, and continues to pivot toward
> higher-value bundled solutions for the Consumer market.** While second quarter
> Consumer subscriber metrics were softer than anticipated, we expect to see an
> improvement in unit trends in the second half of the year.

> "We also are continuing to invest with a 'network first' focus on delivering higher
> broadband speeds and in the transformation and virtualization of our network
> infrastructure through the deployment of NFV[4] and SDN[5] technologies. We ended
> the quarter with more than 8.4 million addressable households and businesses with
> 40 Mbps or higher speeds, including 1.2 million GPON-enabled addressable units.
> We expect to reach 11 million 40 Mbps or higher, including 2 million GPON-
> enabled addressable households and businesses by year-end 2017," concluded Post.

(emphasis added).

135.    On February 23, 2017, Defendants caused the Company to file a Form 10-K with

the SEC announcing the Company's financial and operating results for the fourth quarter and year

ended December 31, 2016 (the "2016 10-K").  The 2016 10-K was signed by Defendants Cole,

Post, Ewing, Bejar, Boulet, Brown, Hanks, Landrieu, Perry, and Siegel.  It also contained SOX

certifications by Defendants Post and Ewing certifying the financial information contained therein

was accurate and disclosed any material changes to the Company's internal control over financial

reporting.  The 2016 10-K reported net income of $626 million, or $1.16 per diluted share, on

revenue of $17.47 billion, compared to net income of $878 million, or $1.58 per diluted share, on

revenue of $17.9 billion for 2015.  Furthermore, the 2016 Form 10-K stated the following in

relevant part regarding the Company's sales practices:

*Products and Services*

From time to time, we change the categorization of our products and services, and we may make similar changes in the future. During the second quarter of 2016, we determined that because of declines due to customer migration to other strategic products and services, certain of our business low-bandwidth data services, specifically our private line (including special access) services in our business segment, are more closely aligned with our legacy services than with our strategic services. As described in greater detail in Note 14—Segment Information, these operating revenues are now reflected as legacy services.

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

**We offer our customers the ability to bundle together several products and services.** For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. **We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.**

***

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

We conduct most of our operations under the brand name "CenturyLink." Our satellite television service is offered on a co-branded basis under the "DIRECTV" name. Our switched digital television service offering is branded under the name "Prism TV." The wireless service that we offer under our agency agreement with Verizon Wireless is marketed under the "Verizon Wireless" brand name.

**Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.** Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing

and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

***

***Consumer Segment***

**Strategic Services**

With respect to providing our strategic services to residential customers, competition is based on price, bandwidth, quality and speed of service, promotions and bundled offerings. Wireless carriers' latest generation technologies are allowing them to more directly compete with our strategic services. The manner in which we compete for broadband customers in this segment is substantially similar to the manner in which we compete for business customers, as described in the above section. In reselling DIRECTV video services, we compete primarily with cable and other satellite companies as well as other sales agents and resellers. Our Prism TV residential video service faces substantial competition from a variety of competitors, including well-established cable companies, satellite companies and several national companies that deliver content over the Internet and on mobile devices. Many of our competitors for these strategic services are not subject to the same regulatory requirements as we are, and therefore are able to avoid significant regulatory costs and obligations.

**Our strategy for maintaining and increasing our base of broadband customers is based on pricing, packaging of services and features and quality of service.** In order to remain competitive, we believe continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. We also continue to expand our marketing and product bundling efforts by offering a variety of bundled products and services with various pricing discounts, as we compete in a maturing market in which a significant portion of consumers already have broadband services. We offer these bundled products and services through various sales and marketing opportunities as further described above under the heading "Sales and Marketing."

(emphasis added).

136.    Regarding the Company's compliance with its written code of conduct, the 2016 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in

the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."

137.    On May 3, 2017, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2017 ("Q1 2017").  The press release stated as follows in relevant part:

> "CenturyLink's first quarter high-bandwidth data services revenues for Enterprise customers grew by 2% sequentially and 4% year-over-year, driven by increasing demand for higher-speed Enterprise data services as businesses continue their digital transformation," said Glen F. Post, III, CenturyLink chief executive officer and president. "This increasing demand further validates the rationale for our pending acquisition of Level 3 Communications, which will transform CenturyLink into the second largest domestic communications provider serving global enterprise customers.
>
> "We continue to make good progress in obtaining the necessary approvals for the pending Level 3 acquisition and integration planning for the combination is on track. We are very pleased with the extremely talented and experienced senior leadership team for the combined company, announced last week, which will be effective at closing. We continue to expect to complete the transaction by the end of September 2017," concluded Post.

138.    On June 1, 2017 Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC. The press release stated in relevant part:

> CenturyLink, Inc. (NYSE: CTL) today announced that upon closing of the CenturyLink – Level 3 acquisition, Jeff Storey, currently president and CEO of Level 3 Communications, Inc. (NYSE: LVLT), will join CenturyLink as its president and chief operating officer. As previously announced, after the closing Glen F. Post III will remain CEO of CenturyLink. It is expected that Storey will succeed Post as CEO of CenturyLink effective Jan. 1, 2019 and that Post will then become executive chairman of the company's board of directors.

The two companies continue to expect to close the transaction by Sept. 30, 2017.

"**Throughout our company's evolution, we have focused on investment, growth and value creation. I** am pleased that our collective work has put us at the forefront of the digital world. As we move into this next phase of our growth, I am confident in the strength of our position, the scope of our opportunity and Jeff's ability to lead our company forward – first as president and COO and then as CEO," Post said. "Transitions like this are bittersweet, but I am confident this is the right time to begin to take this next step into our future. At CenturyLink, I have had the privilege of working with some of the most talented people in our industry. Their leadership, dedication, loyalty and tireless efforts have been – and will continue to be – the key to our success. I look forward to joining forces with Jeff and the talented employees from Level 3 as we pursue the exciting opportunities that lie ahead."

"Jeff has been an excellent leader for Level 3 and shares our excitement about the future of our business and the importance of world-class customer experience to our success," Post said. "**Just as important, Jeff shares my focus on continuing to invest in our network, products and services to meet our customers' needs**. I look forward to continuing to work closely with Jeff to shape the future of the combined company."

"Glen has done an exceptional job leading CenturyLink over the last 25 years, steadily transforming the company to become a leading international communications provider," Storey said. "I strongly believe in the combination of the two companies and I am very excited to become part of the CenturyLink management team after the transaction closes. **I look forward to continuing to work with Glen to drive a successful integration, an outstanding customer experience and growth in shareholder value.** The opportunities ahead of us are exciting and I am committed to building on this impressive foundation."

In addition to Storey, Post's direct reports following the closing of the acquisition will be:

- Stacey Goff, executive vice president, general counsel and chief administrative officer
- Sunit Patel, executive vice president, chief financial officer
- Scott Trezise, executive vice president, human resources

CenturyLink also announced that Harvey P. Perry, vice chairman of the board of CenturyLink, has been appointed chairman of the board, effective immediately. He replaces William A. Owens, who retired from the board on May 24, 2017. W. Bruce Hanks, a member of the CenturyLink board of directors, has been named vice chairman, also effective immediately. As previously announced, Storey is one of four Level 3 board members who will join the CenturyLink board at closing.

"Glen joined what would become today's CenturyLink in 1976, working for our founder, Clarke M. Williams. Throughout his 40-year career, Glen's leadership and vision have transformed CenturyLink into one of the world's leading providers of advanced communications services. Along the way, CenturyLink has created tremendous shareholder value through significant organic growth and successful transactions such as Pacific Telecom, Embarq, Qwest and now Level 3. This leadership succession plan enables Glen to create a smooth transition of the CEO role to Jeff and to continue to have a significant role in the company's future as executive chairman of the board. On behalf of the entire board, I thank Glen for all he has done and will continue to do for CenturyLink. We look forward to working with him and Jeff to realize what we believe is a bright future for the combined company," Perry said.

CenturyLink's headquarters will remain in Monroe, La.

139.     On August 2, 2017, Defendants caused the Company to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2017 ("Q2 2017").  The press release stated as follows in relevant part:

"We are confident our continued investment in high-quality, high-bandwidth broadband network infrastructure positions CenturyLink well for long-term growth," said Glen F. Post, III, CenturyLink chief executive officer and president. "Enterprise demand for high-bandwidth data services remains strong and, while consumer broadband units were weaker than expected, we are encouraged by the higher-value customers our improved offerings are attracting. We accelerated our capital investment in high-bandwidth services and broadband infrastructure during the second quarter, which we believe better positions us to increase revenues in the second half of 2017 and beyond. We anticipate second half and full year 2017 capital expenditures of approximately $1 billion and $2.6 billion, respectively.

"**We achieved our expected adjusted EBITDA for the quarter as our employees did a great job managing costs, while core revenues were below our expectations primarily due to the decline in legacy revenues and the decline in broadband units being higher than anticipated**. We continue to make good progress in obtaining the necessary approvals for the pending Level 3 acquisition, having received clearance in 23 of 25 required states and territories.

Integration planning is progressing well and we continue to anticipate completing the acquisition by the end of September 2017. We remain excited about the value we believe this transaction will create for our customers, our shareholders and our employees," concluded Post.

140.    On March 1, 2018, Defendants caused the Company to file a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2017 (the "2017 10-K").  The 2017 10-K was signed by Defendants Cole, Post, Ewing, Perry, Patel, Hanks, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Landrieu, Siegel, and Storey.  It also contained SOX certifications by Defendants Post and Ewing certifying the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2017 Form 10-K stated the following in relevant part regarding the Company's sales practices:

### Products and Services

In connection with our acquisition of Level 3 on November 1, 2017, we have revised the way we categorize our products and services and report our related revenues under the following categories: IP and data services, transport and infrastructure, voice and collaboration, IT and managed services and regulatory revenues, each of which is described in further detail below. From time to time, we change the categorization of our products and services, and we may make similar changes in the future.

**We offer our customers the ability to bundle together several products and services.** For example, our customers can bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership) and voice services. **We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.**

*** 

### Sales and Marketing

We maintain local offices in most major and secondary markets within the U.S. and in most of the larger population centers within our local service area. In addition, we maintain offices within the primary markets of the more than 60 countries in which we operate. These offices provide sales and customer support services to the communities in our local markets. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

We conduct most of our operations under the brand name "CenturyLink." Our satellite television service is offered on a co-branded basis under the "DIRECTV" name. Our switched digital television service offering is branded under the name "Prism TV."

**Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.** Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

***

*Consumer Segment*

With respect to providing our services to residential customers, competition is based on price, bandwidth, quality and speed of service, promotions and bundled offerings. Wireless carriers' latest generation technologies are allowing them to more directly compete with our services. The manner in which we compete for broadband customers in this segment is substantially similar to the manner in which we compete for business customers, as described in the above section. In reselling DIRECTV video services, we compete primarily with cable and other satellite companies as well as other sales agents and resellers. Our Prism TV residential video service faces substantial competition from a variety of competitors, including well-established cable companies, satellite companies and several national companies that deliver content over the Internet and on mobile devices. Many of our competitors for these types of services are not subject to the same regulatory requirements as we are, and therefore are able to avoid significant regulatory costs and obligations.

**Our strategy for maintaining and increasing our base of broadband customers is based on pricing, packaging of services and features and quality of service.** In order to remain competitive, we believe continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. **We also continue to expand our marketing and product bundling efforts by offering a variety of bundled products and services with various pricing discounts, as we compete in a maturing market in which a significant portion of consumers already have broadband services.** We offer these bundled products and services through various sales and marketing opportunities as further described above under the heading "Sales and Marketing."

Although our status as an ILEC in our local service areas continues to provide us advantages in providing local services in those territories, as noted above, we increasingly face significant competition as an increasing number of consumers are willing to substitute cable, wireless and electronic communications for traditional voice telecommunications services. This has led to an increase in the number and type of competitors within our industry, price compression and a decrease in our market share. As a result of this product substitution, we face greater competition in providing local and long-distance voice services from wireless providers, resellers and sales agents (including ourselves), social media hosts and broadband service providers, including cable companies. We also continue to compete with traditional telecommunications providers, such as national carriers, smaller regional providers, CLECs and independent telephone companies.

**Our strategy to manage customer loss is based primarily on our pricing, packaging of services and features and quality of service. While bundle price discounts have resulted in lower average revenues for our individual services, we believe service bundles continue to positively impact our customer retention.**

(emphasis added).

141.    Regarding the Company's compliance with its written code of conduct, the 2017 10-K stated that "[w]e have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees," that the Code of Conduct was "available in the 'Corporate Governance' section of our website" and that, to the extent "we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC."

142.    These statements were materially false and misleading because they failed to disclose that the Company's revenue and financial performance was due, at least in part, to the undisclosed illegal cramming scheme. Specifically, these representations created the false impression that the Company's financial performance resulted from the pursuit of legitimate business strategies and the purported demand for CenturyLink's services. Further, the Company's

statements attributing revenue performance to purportedly legitimate factors concealed the highly material risks and consequences of the Company's illegal scheme. Moreover, throughout the Relevant Period, Defendants caused the Company to mislead investors concerning the reasons for the Company's financial performance and the business strategies the Company purportedly used to drive subscriber and revenue growth.

**CenturyLink's SEC Filings Failed To Disclose Information Pursuant to Item 303(a) of Regulation S-K**

143.    CenturyLink's SEC filings filed during the Relevant Period, failed to disclose information required to be disclosed therein under Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350. 17 C.F.R. § 299.303. Among other things, Item 303 required CenturyLink to disclose, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

144.    Throughout the Relevant Period, CenturyLink was required under Item 303 to disclose the fact that the Company's illegal and deceptive sales practices were a material driver of the Company's reported revenue for its consumer and small business segments. As set forth above, Defendants knew that these practices had a material impact on the Company's revenues and income, and presented a significant uncertainty given that these practices were illegal and the revenues and income they generated were therefore unsustainable.

**THE TRUTH REGARDING CENTURYLINK'S ILLEGAL SCHEME IS REVEALED**

**The Company's Illegal Scheme is Exposed**

145.    On Friday June 16, 2017, the truth concerning CenturyLink's billing practices and their impact on the Company's financial condition began to be revealed. That same day, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like

Scheme," which reported that Heidi Heiser, the former CenturyLink customer service and sales agent who alleged that she had been fired after publicly raising the issue of the Company's cramming business model to Defendant Post, had filed a whistleblower complaint against the Company. As the article explained, Heiser's complaint revealed that the Company had engaged in a practice of charging customers for services they neither authorized nor requested. The article further explained that, according to Heiser's complaint, to deal with customers complaining about having charges crammed onto their bills, CenturyLink customer service personnel were "directed 'to inform the complaining customer that CenturyLink's system indicated that the customer had approved the service,' . . . and as a result 'it was really the customer's word against CenturyLink.'"

146.    The article also explained that Heiser was fired two days after directly informing Defendant Post of these practices at an internal, Company-wide question-and- answer session. In addition, the article connected the revelations to the recently-uncovered fraud at Wells Fargo, noting that "[t]he complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to 'many millions' of dollars."

147.    This disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning CenturyLink's purportedly "customer first" sales practices, and also revealed that the Company's revenues had been inflated by cramming. Market reaction to the news was swift. As a result of these revelations, the Company's stock plummeted, falling $1.23 per share – nearly 5% –from the previous day's close of $26.95 to close at $25.72 on June 16, 2017.

148.    Defendants attempted minimize the impact of the revelations in the *Bloomberg* article. In articles published on June 16, 2017 in technology and communications publications *Ars*

*Technica* and *CRN*, CenturyLink claimed that the conduct alleged in Heiser's complaint was "completely inconsistent with our company policies, culture, and Unifying Principles, which include honesty and integrity," and pleaded ignorance on the part of the Company's senior executives, stating that "our leadership team was not aware of this matter until the lawsuit was filed."

149.     On Monday, June 19, 2017, at 9:30 a.m., *Bloomberg* reported that a consumer class action lawsuit arising out of CenturyLink's billing misconduct had been filed in California the night before. The article explained that the lawsuit detailed how "Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged" were "consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink." The article noted that the "damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."  Shortly thereafter, numerous consumer class action lawsuits were filed in courts across the country.

150.     Significantly, on June 22, 2017, the Company disclosed that Defendant Douglas – who had been the senior-most executive responsible for consumer sales and was just appointed by Defendant Post in April 2017 to serve as a member of the combined Company's senior leadership team – would be leaving the Company as soon as the merger closed.

**The Minnesota Attorney General Reveals CenturyLink's Fraudulent Sales Practices**

151.     On July 12, 2017, news reports disclosed that the Minnesota Attorney General filed suit against CenturyLink in Minnesota state court following a year-long investigation that cited internal Company documents, emails, and call recordings revealing extensive detail as to how the Company fraudulently charged Minnesota consumers in violation of Minnesota's consumer protection laws.

152.    The Minnesota Attorney General's complaint provided details concerning the means by which the Company cheated customers. Specifically, the complaint detailed how CenturyLink's complex pricing systems, exception-laden promotional strategies, and myriad fees contributed to CenturyLink sales representatives systematically misquoting and misrepresenting prices to customers that the Company refused to honor. For example, the Minnesota Attorney General's complaint contained several examples of customers who were defrauded by CenturyLink, including the following:

- **B.T.** uses his Ph.D. in applied economics to scrutinize financial information for his employer. CenturyLink offered him internet service for $14.95 per month for one year and $24.95 per month for a second year. CenturyLink actually charged him a base rate of $29.95 per month. **CenturyLink repeatedly refused to honor its offer** and threatened to charge him a $200 penalty if he cancelled his service, even though the company's complaint file states that CenturyLink listened to the recording of the sales call and confirmed the "misquote." CenturyLink told B.T. that "no one at CenturyLink can get you that price," even though the company had promised it to him.

- **J.S.** is an occupational therapist. She accepted CenturyLink's offer of internet and television service for $91.83 per month for one year. CenturyLink **repeatedly failed to honor its promise** and charged her $202.04, $103.43, $116.97, $108.15, and $128.26, respectively, the first five months she had this package. CenturyLink told her its billing system is "complicated" and "hard to explain" and that sales agents can offer promotions that the system then "removes."

- **K.N.** is 60 years old and lives in Britt. CenturyLink promised him internet service for a base rate of $29.95 per month but **failed to bill him as promised**, charging him a base

rate of $61 instead. CenturyLink told him, "you're doing math, and you're trying to break [the cost] down in a way that it's not supposed to be broken down . . . there's no 'this is how much it costs.'" K.N. asked how much the company would charge him the next month, and CenturyLink said, "honestly, you're not going to know . . . until the next bill prints." CenturyLink later wrote to him stating he was "ineligible" for the offer CenturyLink promised him and that he had accepted months earlier.

- **K.K.** is a legal assistant. CenturyLink promised her internet service for $24.99 per month, but the company charged her a base rate of $44.95 per month. CenturyLink claimed the offer she had already accepted was "not available" to her. **CenturyLink refused to honor its offer.** The threat of a cancellation penalty trapped K.K. into staying with CenturyLink.

- **S.H.** is a 70-year-old former director of a non-profit organization. She purchased a CenturyLink package that the company said would cost a total of approximately $54 per month. CenturyLink actually charged her $103.87. When S.H. called about the bill, a supervisor told her the discrepancy would be fixed the following month. The company charged her $76.46 and $77.96 the following months. **CenturyLink then refused to honor its offer.**

(emphasis in original). In total, the complaint cited 35 specific examples of customers who were defrauded, and provided significant detail as to how the Company's billing scheme was carried out.

153.    The complaint also cited an April 2015 email from a Company employee stating that she got "so many" complaints per day and that:

> maybe 1 out of 5 [customers] are quoted correctly or close enough. I have one today quoted $39 and its [actually] over $100 monthly. So I tend to get on the

defensive for the customer at times because of the large amount that are misquoted. As in many cases, the customer calls in for several months and promised call backs, passed around, or cut off before going to the AG, PUC, FCC or BBB . . . .

154.    In a May 2015 conversation recorded by CenturyLink that was obtained and cited by the Minnesota Attorney General, another Company employee stated that "there are not enough people to do the work" of responding to the complaints, and that there was a "whole pile of Minnesota [complaints] to go through…they usually come in groups of 10."

155.    The lawsuit also revealed that the Company had systematically refused to honor the prices it quoted customers, and internally documented this fraudulent practice. Citing internal recordings and reviews of internal Company documents, the complaint detailed how CenturyLink refused to correct customers' improper and fraudulent bills. For example:

- A sales representative told a customer that "no one can get you that price" even though the Company's complaint file states that CenturyLink listened to a recording of the phone call and internally confirmed the "misquote" by the sales representative;

- A CenturyLink representative admitted to a customer that "you were misquoted," but that "I can't give it [the quoted price] to you, no one can";

- A CenturyLink representative told a customer that its offers are "not binding";

- Another CenturyLink representative told a customer that the discounts that it had offered need not be honored because they are "a gift from us to you";

- After a CenturyLink customer called to complain that her bill had increased more than 50% the month after CenturyLink promised to change her rate, and cited the confirmation number she was given, the representative told her that CenturyLink can "give you all the confirmation numbers in the world" but that if CenturyLink "quotes you [a rate] not available it's going to get denied."

156.    The details provided in the Minnesota Attorney General's complaint also further revealed the financial impact of the Company's fraudulent practices. For example, in the 35 examples cited in the complaint, the fraudulent pricing added from $10 to over $100 increases in

monthly charges, in many cases more than doubling customers' bills. In a press conference held the same day the suit was filed, General Swanson said that, while unsure of the precise number of Minnesota customers impacted or the amount of restitution that would be required, she expected the numbers to be "very, very significant."

157.    The Minnesota Attorney General's complaint and General Swanson's press conference announcing the lawsuit were covered extensively in the press. For example, a July 12, 2017 *Bloomberg* article reporting on the lawsuit revealed that the Minnesota Attorney General had been investigating CenturyLink for over a year. The article explained that, contrary to CenturyLink's claims that it had cooperated in the investigation, the Company had in fact frustrated the Attorney General's inquiry by falsely claiming that certain customer call recordings did not exist. In fact, General Swanson obtained them by subpoenaing a third-party CenturyLink vendor that had custody of the calls. The report also explained that the Company had also refused to provide basic pricing information, claiming doing so was "unduly burdensome." Similarly, the Minnesota Star Tribune confirmed CenturyLink attempted to conceal its unlawful practices, reporting that General Swanson said that CenturyLink was "lackluster" in responding to the State's investigation. According to General Swanson, in the course of the investigation, "[t]he company was contacted hundreds of times," and that "[t]his issue has been going on for a long, long time. We felt the need for judicial intervention."

158.    On October 23, 2017, CenturyLink entered into a stipulated consent order with the Minnesota Attorney General in which it agreed to dramatically reform its sales practices in Minnesota. Specifically, CenturyLink agreed to "in a clear and conspicuous manner disclose to Minnesota consumers at the time of sale" significantly more information than the Company had throughout the Relevant Period, including the monthly base prices of services, an itemization of

fees, the time period during which quoted prices applied, information about whether CenturyLink guaranteed the fees, and any restrictions or conditions on a customer's ability to receive the quoted prices. The consent order also prohibited CenturyLink from charging Minnesota consumers amounts greater than those that had been disclosed, to refuse to honor quoted prices on the basis of undisclosed conditions or restrictions, and required the Company to "implement processes and procedures, and provide sufficient training designed to ensure" that the Company made adequate disclosures to consumers. That CenturyLink was required to stipulate to providing such basic information and assurances confirmed that the Company's representations about its customer service and sales practices throughout the Relevant Period were materially false and misleading, as they did not include even basic measures to ensure customers were quoted the correct price or that customer complaints were properly investigated and handled.

### THE SPECIAL LITIGATION COMMITTEE'S LACK OF A PROPER, GOOD FAITH INVESTIGATION

On its second quarter August 2, 2017 earnings call, CenturyLink disclosed that it had formed a Special Litigation Committee to investigate the Company's consumer billing practices—but Defendant Post refused to answer any questions about the investigation, the Company's billing practices, or their impact on the Company, stating that "we cannot speak for the work [of the committee] before it's complete." Defendants Perry, Hanks, and Bejar were appointed to the Special Litigation Committee.  Shortly thereafter, Defendant Bejar and, following the Level 3 Combination, Defendant Chilton were appointed to a special litigation committee to investigate allegations of impropriety.

159.    On December 7, 2017, the Company announced the results of the Special Litigation Committee's investigation into the Company's sales and billing practices. Although CenturyLink claimed that this investigation "did not reveal evidence to conclude that any member of the

Company's management team engaged in fraud or wrongdoing" – despite the overwhelming evidence cited above confirming the contrary – the Company admitted several key findings demonstrating that its Relevant Period statements were materially false and misleading when made.

160.    Specifically, in late 2017, the Special Litigation Committee concluded its review and issued its key findings. These findings included that:

- "[s]ome of the Company's products, pricing and promotions were complex and caused confusion, and the resulting bills sometimes failed to meet customer expectations";

- "limitations in the Company's ordering and billing software made it difficult to provide customers with estimates of their bills and confirmation of service letters that reflected all discounts, prorated charges, taxes and fees";

- "[s]ystems and human errors led to certain customers not receiving an offered point-of-sale discount"; and

- "[t]he Company did not fully address this issue in a timely manner for some customers."

161.    In April 2018, the Special Litigation Committee concluded its review and it, along with the Board, declined - despite the overwhelming evidence cited above - to take any action. The committee investigation failed to disclose the breadth, or lack thereof, of its review and did not cite any person or persons who had committed the wrongdoing in a clear attempt to white-wash the wrongdoing and quickly, but ineffectively end the inquiry. The Special Litigation Committee failed to recover any damages that were incurred as a result of the wrongdoing.

162.    Despite the fact that the Special Litigation Committee was purportedly engaged in investigating defendants' misconduct, the Board has failed, *inter alia*, to do the following: (a) issue any reports of the Special Litigation Committee's purported findings; (b) terminate anyone in connection with the Special Litigation Committee's findings; (c) recoup any performance-based

compensation paid to defendants during the Relevant Period; or (d) recoup any severance or retirement benefits from certain Defendants. In sum, during the entire existence of the Special Litigation Committee, which has now been "formally disbanded" despite the Company's massive exposure, it took no action resulting from its purported "investigation."

163.    Numerous investigations by state attorneys general and other regulatory authorities into CenturyLink's fraudulent billing practices remain pending, and reveal the scope of the illegal scheme.

## DEFENDANT POST WAS RICHLY REWARDED DESPITE THE COMPANY'S ILLEGAL SCHME

164.    On March 6, 2018, the Company issued a press release announcing that Defendant Post would be retiring in May and Defendant Storey will take his place as CEO on that date. Post had previously announced his intention to stay on with the Company as CEO until January 1, 2019.

165.    In connection with Post's retirement, he stands to receive: i) vesting of half of his 2018 time-vested restricted shares; ii) retention of half of his 2018 performance-based restricted shares subject to their original performance conditions; iii) vesting of the equity portion of his 2017 special integration award at a 100% payout rate; and iv) full vesting of all time-vested restricted shares granted to him before 2018 and to retain, subject to their original performance conditions, all performance-based restricted shares granted to him before 2018.

166.    Clearly, this decision to reward Post despite his disastrous tenure with the Company is not a protected business judgment. These severance payments were underserved and not aligned with the Company's shareholders' interest.

## DAMAGES TO CENTURYLINK CAUSED BY THE DEFENDANTS

167.    As a result of Defendants' illegal scheme, the Individual Defendants have irreparably damaged CenturyLink's credibility, corporate image and goodwill.

168.    Further, as a direct and proximate result of the Individual Defendants' actions, CenturyLink has expended and will continue to expend significant sums of money.  Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.    costs incurred from investigating, defending and paying any settlement or judgment pursuant to multiple investigations over the Company's illegal business practices;

b.    costs incurred from investigating, defending and paying any settlement or judgment in the class actions for violations of federal securities laws;

c.    millions of dollars in the form of compensation and benefits the Company paid to the Defendants, who have systematically breached their duties to CenturyLink; and

d.    possible increases in borrowing costs.

## DEMAND REFUSED ALLEGATIONS

169.    Plaintiff will adequately and fairly represent the interests of CenturyLink in enforcing and prosecuting its rights.

170.    Plaintiff was a shareholder of CenturyLink common stock at the time of the wrongdoing alleged herein and has been continuously since and plans to continue to hold CenturyLink shares until the conclusion of this derivative litigation.

171.    On October 18, 2018, Plaintiff made a demand pursuant to LA Rev. Stat. § 12:1-742.  Specifically, Plaintiff demanded that the Board created a committee composed of independent directors, who are not currently involved in any litigation as a result of their positions with the Company, to investigate and take full corrective action, if warranted, against several current and former officers and directors of the Company.  Plaintiff's demand is attached hereto as Exhibit A.

172.    In response to Plaintiff's demand, on December 6, 2018, Defendants refused

Plaintiff's demand stating:

> The SLC has carefully considered the demands made by you, which allege the same issues raised by other shareholders. The SLC found no evidence to support the allegations in the demand letters. The SLC also considered the institutional changes and advancements at CenturyLink as well as the pending litigation and other regulatory matters CenturyLink now faces. In light of all of the information and relevant considerations, and the legal standards set forth in La R.S: 12:1-830 *et seq.* and La R.S. 12:1-840 *et seq.*, as well as other relevant statutes, the SLC has determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company. Accordingly, pursuant to La. R.S. 12:1-740 *et seq.*, the SLC is rejecting your demand.

Defendants' response is attached hereto as Exhibit B.

173.    Based on Defendants' refusal of Plaintiff's demand and lack of information

provided regarding the SLC's investigation, Plaintiff is not able to evaluate whether the SLC

properly investigated whether Defendants breached their fiduciary duties.  Despite the fact that the

Special Litigation Committee was purportedly engaged in investigating defendants' misconduct,

the Board has failed, *inter alia*, to do the following: (a) issue any reports of the Special Litigation

Committee's purported findings; (b) terminate anyone in connection with the Special Litigation

Committee's findings; (c) recoup any performance-based compensation paid to Defendants during

the Relevant Period; or (d) recoup any severance or retirement benefits from certain Defendants.

In sum, during the entire existence of the Special Litigation Committee, which has now been

"formally disbanded" despite the Company's massive exposure, it took no action resulting from

its purported "investigation."

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

174.    In committing the wrongful acts complained of herein, Defendants have pursued,

or joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

175.    During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company had adopted unethical, improper and illegal billing and operational practices; (ii) maintain Defendants' directorial and/or executive positions at CenturyLink and the profits, power and prestige that Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of CenturyLink, regarding Defendants' management of CenturyLink's operations, the Company's financial health and stability, and the Company's business prospects.    In furtherance of this plan, Defendants collectively and individually took the actions set forth herein.

176.    Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, Defendants caused the Company to conceal its misrepresentation of its true business practices.

177.    The purpose and effect of Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, waste of corporate assets and abuse of control; to conceal material adverse information concerning the Company's operations, financial condition and future business prospects; and to profit from and protect their positions as directors and/or executives of the Company and the benefits they obtained as a result.

178.    Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and financial results.  Because the actions complained of herein occurred

under the authority of the Board, each of the Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

179.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## COUNT I

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

180.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

181.    The Individual Defendants owed and owe CenturyLink fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care.

182.    The Individual Defendants owed a fiduciary duty to CenturyLink to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate and conformed to federal and state securities law.  The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of CenturyLink's internal controls and by allowing materially false and misleading statements and filings to be issued.

183.    The Individual Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that CenturyLink complied with federal and state laws, rules and regulations, as well as the Company's own internal policies and procedures.

184.    As members of the CenturyLink Board, the Individual Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein.  Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected CenturyLink to unreasonable risks of loss and expenses.

185.    Each of the Individual Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating their oversight responsibilities to the Company has subjected the Company to liability for violations of federal and state law, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and/or directors of the Company.  As a result of the Individual Defendants' breaches, CenturyLink has lost market capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

186.    By reason of the foregoing, CenturyLink was damaged.

187.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT II

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

188.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

189.    The Individual Defendants had a duty to CenturyLink and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

190.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to

prudently managing the business of CenturyLink in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of CenturyLink' affairs and in the use and preservation of the Company's assets.

191.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused CenturyLink to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to CenturyLink, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged CenturyLink.

192.    By reason of the foregoing, CenturyLink was damaged.

193.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT III

### AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

194.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

195.    Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of CenturyLink's internal controls and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

196.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duties, CenturyLink has wasted valuable corporate assets through payments of compensation to certain of its executive officers.  In addition, the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

197.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.    By reason of the foregoing, CenturyLink was damaged.

199.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

200.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

201.    Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CenturyLink.  The wrongful conduct was continuous and resulted in ongoing harm to the Company.  The Individual Defendants were unjustly enriched pursuant to receiving compensation and director remuneration while breaching their fiduciary duties to the Company, as alleged herein.

202.    Plaintiff, as a shareholder of CenturyLink, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

203.    By reason of the foregoing, CenturyLink was damaged.

204.    Plaintiff, on behalf of CenturyLink, has no adequate remedy at law.

## COUNT V

### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

205.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

206.    The Individual Defendants owed duties as controlling persons to CenturyLink's public shareholders not to use their positions of control within the Company for their own personal interests and contrary to the interest of the Company's public shareholders.

207.    The conduct of the Individual Defendants amounted to an abuse of their abilities to control CenturyLink in violation of their obligations to CenturyLink and the Company's public shareholders.

208.    As a result of the Individual Defendants' abuse of control, CenturyLink has sustained and will continue to sustain irreparable injury, for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Directing the Individual Defendants to account to CenturyLink for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Requiring the Individual Defendants to return to CenturyLink all salaries, bonuses and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to CenturyLink;

C.    Directing the Individual Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of the Individual Defendants' culpable conduct;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December 26, 2018                    Respectfully submitted,

                                            s/ Ravi Sangisetty
                                            Ravi Sangisetty (LA #30709)
                                            SANGISETTY LAW FIRM
                                            3914 Canal St.
                                            New Orleans, LA 70119
                                            Phone: (504) 662-1016
                                            rks@sangisettylaw.com

                                            William B. Federman, Esq.
                                            FEDERMAN & SHERWOOD
                                            10205 N. Pennsylvania Avenue
                                            Oklahoma City, OK 73120
                                            Phone: (405) 235-1560
                                            Fax: (405) 239-2112
                                            wbf@federmanlaw.com
                                            -and-
                                            2926 Maple Avenue, Suite 200
                                            Dallas, TX 75201

                                            *Attorneys for Plaintiff*